UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| GUMWOOD HP SHOPPING PARTNERS, L.P., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 3:11-CV-268 JD |
| SIMON PROPERTY GROUP, INC., | ) ) ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This is an antitrust case in which the developer of an upscale shopping center asserts that the defendant, the largest public real estate company in the country, engaged in anticompetitive tactics to coerce retailers to stay out of the new development and instead sign leases at its nearby mall. The plaintiff, Gumwood HP Shopping Partners, L.P., was developing an outdoor shopping center in Mishawaka, Indiana, named Heritage Square, where it hoped to attract high-end retailers such as Ann Taylor Loft, Coldwater Creek, and Chico's. The defendant, Simon Property Group, Inc., owned an established mall less than a mile away, known as University Park Mall. Around the same time that Gumwood was developing Heritage Square, Simon was redeveloping a portion of University Park to add an outdoor component that also hoped to attract some of the same high-end retailers. According to Gumwood, Simon threatened certain retailers, in particular Ann Taylor, that if they opened stores at Heritage Square instead of University Park, Simon would terminate their leases in some of Simon's best properties elsewhere in the country. Though Ann Taylor initially signed a lease at Heritage Square, it never opened a store there, and it eventually signed a lease and opened a Loft store at University Park instead.

In this action, Gumwood asserts that Simon's conduct constituted an unlawful tying arrangement, so it has asserted claims under Sections 1 and 2 of the Sherman Act. Discovery is now closed, and the parties have filed cross-motions for summary judgment. Simon has also filed two motions to strike and a motion for oral argument. For the following reasons, the motions for summary judgment and the other ancillary motions are each denied.

## I. FACTUAL BACKGROUND[1]

Simon is a real estate entity that owns hundreds of retail properties around the country and around the world. Simon owns various types of shopping centers, including regional and super-regional malls, lifestyle centers, and outlet malls. Regional and super-regional malls are typically large, indoor shopping centers that are anchored by one or more department stores. Lifestyle centers are smaller, outdoor shopping centers that typically include national retail chains mixed with restaurants and possibly entertainment outlets like a movie theater. Outlet centers typically house national retailers selling reduced-price versions of their products. While malls and lifestyle centers typically draw customers from five to fifteen miles away, outlet centers may draw customers from up to seventy-five miles away.

Among Simon's properties are Dadeland Mall, located in Miami, Florida, and Lenox Square, in Atlanta, Georgia, both of which are super-regional malls. Simon also owns an outlet center known as Woodbury Common Premium Outlets in New York, which is regarded as one of the premier outlet malls in the country. Simon also owns University Park, a super-regional mall in Mishawaka, Indiana. University Park opened in 1979, and has nearly one million square feet

_____

[1] Simon has filed two motions to strike certain exhibits and factual assertions. [DE 156, 159]. Having reviewed each of the respective filings, the Court has determined that none of the exhibits or facts that are subject to the motions are necessary to the resolution of the motions for summary judgment. Accordingly, both motions to strike are denied as moot.

of leasable space. Though it is located near a dense shopping area with strip malls, standalone stores, and plazas with big-box retailers, University Park is the only mall in the area. In 2006, the Marshall Field's department store, which was one of University Park's anchors, closed its store. Rather than replace the store with another department store, Simon demolished the building and constructed an outdoor "streetscape" with outward facing retail stores. In essence, this addition was a lifestyle center appended to the existing mall.

Beginning around 2005, Gumwood began developing Heritage Square, a lifestyle center located less than a mile from University Park. Heritage Square was anchored by a grocery store, and it also included retail space that it hoped to fill with national retailers like Ann Taylor, Coldwater Creek, Chico's, Lane Bryant, Talbot's, and Barnes and Noble. In April 2006, after negotiations with Gumwood's leasing agent, Ann Taylor internally approved a proposed deal to open one of its Loft stores at Heritage Square. After further negotiations, Ann Taylor executed a ten-year lease for Heritage Square on June 14, 2006, and Gumwood executed the lease shortly thereafter. As is common in the industry, the lease included certain contingencies based on other retailers having signed leases at the shopping center. In particular, the lease stated that Ann Taylor would not be required to open its store at Heritage Square unless certain other retailers had also signed leases, including Coldwater Creek, Brooks Brothers, Ruth's Chris Steak House, and Martin's Super Market. If those requirements were not met but Ann Taylor chose to open its store anyway, it would be entitled to pay rent at a reduced rate.

Immediately after the lease was executed, Ann Taylor requested to rescind the lease, indicating that it was concerned about the co-tenancy provision. Gumwood refused to rescind the lease, but the parties agreed to an amendment that altered the co-tenancy provision. Under the amendment, Ann Taylor would not be required to open the Loft store at Heritage Square or to

pay rent until each of Coldwater Creek, Brooks Brothers 346 (a new concept store being tested by Brooks Brothers), White House/Black Market, and Martin's Super Market had also opened. The parties executed that amendment in mid-August 2006.

Around this same time, Simon learned that Ann Taylor signed a lease at Heritage Square. That came as a surprise to Simon, which believed that Ann Taylor had already orally committed to coming to University Park, and which viewed the Loft store as important to the success of the new lifestyle center component of University Park. Gumwood alleges that, in response, Simon began to impose a tying arrangement by which it threatened to cancel Ann Taylor's leases at Dadeland, Lenox, and Woodbury (where it had very successful stores whose leases were about to expire) if Ann Taylor opened its store at Heritage Square or did not come to University Park. An internal Simon document that recaps a meeting with Ann Taylor's representatives on August 15, 2006, outlines the following strategy for Simon's business with Ann Taylor: "Create leverage with renewals on more mature accounts . . . . We need a positive decision on University Park before we will move forward with any key renewals. Woodbury and Lenox would be prime centers to kill if the negotiations go south." [DE 129-8].

In an internal email describing that meeting, one of Simon's negotiators wrote:

[T]hey [Ann Taylor] do have an executed lease, with [H]eritage, however, the developer has yet to satisfy the co tenancy. . . . We are putting the full court pressure on all others who are interested in the market[.] I was very clear that their decision can and will jeopardize our willingness to proceed on new deals and renewals.

[DE 129-33]. The following month, that same individual wrote in another internal email:

I will still help where needed but in essence DS [David Simon, Simon's CEO] is trying to meet with Kay Krill [Ann Taylor's CEO]. I don't believe John [Scotti, Ann Taylor's negotiator] has told Kay the severity of the situation. If they go ahead with Heritage we're going to cancel Woodbury and Dadeland. Lose a pinky - take an arm!

[DE 129-34 (punctuation and capitalization modified for clarity)]. In addition, Simon decided at that time to begin negotiating its leases with Ann Taylor on a portfolio basis. Thus, it negotiated the fifty-plus new leases or lease renewals that were pending as a single package, with the understanding that none of the leases would be final until the entire package had been agreed on. Accordingly, it held certain lease agreements that had already been negotiated until the entire portfolio negotiations were complete.

Meanwhile, while its discussions with Simon were ongoing, Ann Taylor took possession of the premises at Heritage Square in August 2006 and began construction of the store with the goal of opening in time for the Christmas shopping season. By taking possession of the premises, Ann Taylor lost its right to terminate the lease after the first year if Heritage Square had not yet satisfied the co-tenancy provisions. However, after about two weeks of construction, during which it incurred over $100,000 in construction costs, Ann Taylor abruptly halted construction. Ann Taylor had no ability to terminate the lease, and it gave no definitive indication to Gumwood as to its future intent, but the premises began to sit idle, with no efforts being made towards the store's opening. In addition, in December 2006, Brooks Brothers decided that it was going to discontinue its "346" concept stores, so it gave notice to Gumwood that it was not going to open at Heritage Square. Because the "346" store was a required co-tenant under Ann Taylor's lease, that meant that Gumwood would never be able to satisfy the co-tenancy provision and that Ann Taylor would never be required to open its store at Heritage Square. It could still choose to do so, though, and pay rent at a reduced rate.

Then, in April 2007, Ann Taylor initiated discussions with Gumwood to negotiate a second amendment to its lease at Heritage Square. It indicated that it wished to immediately resume construction and open the store at Heritage Square. The lease amendment would have

eliminated Brooks Brothers 346 as a required cotenant, and would have called for Ann Taylor to resume construction and open its store. The amendment would have also provided an additional construction allowance for Ann Taylor. However, on April 20, 2007, after negotiating and drafting the terms of the amendment, Ann Taylor decided not to sign it, and progress again stalled. Subsequently, in July 2007, Ann Taylor considered the possibility of opening an Ann Taylor Factory store at Heritage Square instead of a Loft store, but it decided not to open a Factory store in Mishawaka at all. After that point, Ann Taylor did not take any further concrete steps towards opening a Loft store at Heritage Square. It was still unable to terminate the existing lease, though, and it stayed in periodic contact with Gumwood as to the possibility of opening the store at Heritage Square.

Simon's portfolio negotiations with Ann Taylor also continued for a considerable length of time, and a lease for Ann Taylor Loft at University Park was among the leases included in those negotiations. Simon in particular sought to include it in the deal, though Ann Taylor generally expressed indifference to opening at University Park, and indicated that it might not open a store in Mishawaka at all. By the end of 2007, the portfolio negotiations were approaching their conclusion, though the parties had not executed any leases yet. In January 2008, though, in response to the economic recession, Ann Taylor announced that it would be closing over 100 stores and that it was cutting back on opening new stores. This threw its pending negotiations with Simon into turmoil, as the closures included a number of Simon properties and stores that had been subject to their portfolio negotiations. On February 11, 2008, Simon's CEO sent a letter to Ann Taylor's CEO, stating in part, "[N]ot going forward with committed deals puts us in an untenable situation. You can't expect us to renew leases at Woodbury Commons, Dadeland Mall and Burlington Mall (just to name a few) while you are

closing stores and reneging on recent commitments to us." [DE 129-49]. The CEOs spoke the following week and arrived at a deal by which Ann Taylor agreed to open a store at University Park and delay its closures of certain other stores. In return, Simon agreed to execute lease renewals at other of its properties that were important to Ann Taylor. The parties then began executing the leases in batches, and Ann Taylor's lease for University Park was fully executed on July 11, 2008. Ann Taylor thereafter opened a Loft store at University Park in March 2009.

Despite losing Ann Taylor as a tenant, Heritage Square still had some success in attracting high-end retailers. Coldwater Creek, White House/Black Market, and Aveda each signed leases with and opened at Heritage Square. Eddie Bauer also closed its store at University Park and relocated to Heritage Square. However, Gumwood asserts that Ann Taylor's absence at Heritage Square not only cost it the rent it would have received from Ann Taylor, but also triggered a snowball effect that caused it to lose other retailers and to receive less rental income from its existing tenants. When its revenues eventually became insufficient to cover its interest expenses and it was unable to restructure its debt, Gumwood defaulted on its loan. The loan, which then had a balance of about $33 million, was sold in November 2010 for $12.5 million. In January 2011, Gumwood transferred ownership of Heritage Square to its lender through a deed in lieu of foreclosure, at which time it was relieved of any further obligation to repay the loan. Gumwood then initiated this action by filing its complaint on June 29, 2011.

## II.  STANDARD OF REVIEW

On summary judgment, the moving party bears the burden of demonstrating that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A "material" fact is one identified by the substantive law as affecting the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A "genuine issue" exists with respect to any material fact when "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Id*. Where a factual record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial, and summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)).

In determining whether a genuine issue of material fact exists, this Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in that party's favor. *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008); *King v. Preferred Tech. Grp.*, 166 F.3d 887, 890 (7th Cir. 1999). However, the non-moving party cannot simply rest on the allegations or denials contained in its pleadings, but must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000).

### III. DISCUSSION

Gumwood asserts antitrust claims against Simon under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. Section 1 of the Sherman Act prohibits combinations or conspiracies in restraint of trade, while Section 2 prohibits the use of anticompetitive means to create or maintain a monopoly. Both of Gumwood's claims rely on the same theory, which is that Simon engaged in anticompetitive conduct through an unlawful tying arrangement. Specifically, Gumwood alleges that Simon threatened retailers that if they opened stores at Gumwood's Heritage Square or did not open at Simon's University Park Mall, Simon would refuse to renew those retailers' leases in other of its properties.

Both parties have moved for summary judgment. Simon asks that Gumwood's claims be dismissed in their entirety, arguing that Gumwood is unable to establish certain elements of its

claims, and also that the claims are barred by the statute of limitations. Gumwood seeks summary judgment in its favor on the merits of its claims, leaving only the measure of damages to be determined. It also seeks a ruling that the collateral source doctrine prevents its damages from being reduced by other sources that have offset its losses. The Court first considers whether summary judgment is warranted in either party's favor on the merits of the claims. The Court then turns to the statute of limitations and collateral source issues.

## A. Merits of the Antitrust Claims

As noted, both of Gumwood's claims arise out of a tying arrangement allegedly imposed by Simon. In a typical tying arrangement, a seller agrees to sell a product over which the seller has a monopoly (the tying product) only if the buyer also purchases a separate product (the tied product) from the seller, or agrees not to purchase that product from a competing seller. *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5–6 (1958); *Carl Sandburg Vill. Condo Ass'n No. 1 v. First Condo. Dev. Co.*, 758 F.2d 203, 207 (7th Cir. 1985). "The traditional antitrust concern with such an agreement is that if the seller of the tying product is a monopolist, the tie-in will force anyone who wants the monopolized product to buy the tied product from him as well, and the result will be a second monopoly." *Sheridan v. Marathon Petroleum Co. LLC*, 530 F.3d 590, 592 (7th Cir. 2008); *see also It's My Party, Inc. v. Live Nation, Inc.*, No. 15-1278, 2016 WL 426085, at *5 (4th Cir. Feb. 4, 2016) ("Tying suppresses competition in two ways: First, the buyer is prevented from seeking alternative sources of supply for the tied product; second, competing suppliers of the tied product are foreclosed from that part of the market which is subject to the tying arrangement." (internal quotation omitted)). In the Seventh Circuit, to demonstrate that a tying arrangement is unlawful *per se*, a plaintiff must prove the following four elements: (1) two separate products have been tied together; (2) the tying seller has sufficient economic power in the market for the tying product to restrain free competition in the tied product market; (3) the tie

affects a not-insubstantial amount of interstate commerce in the tied product; and (4) the tying seller has some economic interest in the sales of the tied product. *Reifert v. S. Cent. Wisc. MLS Corp.*, 450 F.3d 312, 317 (7th Cir. 2006) (citing *Carl Sandburg*, 758 F.2d at 207).

In its motion for summary judgment, Simon focuses on the first element, arguing that there is insufficient evidence to show that it actually imposed a tie between any properties. It also argues that an additional element should be required—harm to competition—and that Gumwood is unable to satisfy that element. The Court considers those issues in turn. Meanwhile, as a plaintiff seeking summary judgment in its favor, Gumwood's motion must address every element of its claims, and it must establish that the evidence indisputably proves every one of those elements. The Court thus need not dwell on Gumwood's motion, as the record reflects deep factual disputes on multiple issues, including in particular the definition of the relevant markets, whether Simon has market power in those markets, and whether Simon actually imposed a tie. Because the dispute over the existence of a tie, which is central to Simon's motion, is sufficient to deny Gumwood's motion for summary judgment, the Court does not reach the remaining issues raised in Gumwood's motion.

### 1.     The Existence of an Unlawful Tying Arrangement

Both parties argue that the record indisputably supports their positions as to whether Simon tied two products (or in this case, properties) together. The existence of a tie requires more than just a package deal or a request to purchase two products together. As the Supreme Court has stated, "the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer . . . might have preferred to purchase elsewhere on different terms." *Jefferson Parish*, 466 U.S. at 12. Thus, an unlawful tie depends on some sort of coercion by the seller to cause the buyer to accept a condition—either purchasing the tied product from the seller

or refraining from purchasing that product from a competitor—on the sale of the tying product. "[S]trong persuasion, encouragement, or cajolery to the point of obnoxiousness" to induce a buyer to accept a package deal do not suffice. *Bob Maxfield, Inc. v. Am. Motors Corp.*, 637 F.2d 1033, 1037 (5th Cir. 1981); *Unijax, Inc. v. Champion Int'l, Inc.*, 683 F.2d 678, 685–86 (2d Cir. 1982) (holding that "aggressive salesmanship" is insufficient to establish a tie). Rather, the seller must somehow convey to the buyer that the buyer *must* accept the condition in order to receive the tying product. *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1159 (9th Cir. 2003) ("A plaintiff must present evidence that the defendant went beyond persuasion and coerced or forced its customer to buy the tied product in order to obtain the tying product."); Areeda & Hovenkamp, Antitrust Law ¶ 1752b (3d ed. 2011) ("There is no tie for any antitrust purpose unless the defendant improperly imposes conditions that explicitly or practically require buyers to take the second product if they want the first one.").

Simon argues that to meet this element, a plaintiff must establish two distinct requirements: first, that the defendant imposed a condition by *refusing or threatening to refuse* to sell the tying product without the tied product; and second, that the defendant *coerced* the buyer into accepting that condition. However, the Court agrees with Gumwood that those requirements are not completely distinct. Instead, a threat to refuse to sell the tying product unless the buyer purchases the tied product is one method of effecting the coercion that this element requires.[2]

---

[2] There are other methods, too, such as using differential pricing, *e.g.*, *Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 270–73 (6th Cir. 2015), or adopting policies or designing a product such that the tied product is the only viable economic option to use in concert with the tying product, *e.g.*, *Smith v. eBay Corp.*, No. C 10-03825, 2012 WL 27718, at *6 (N.D. Cal. Jan. 5, 2012), though those are not at issue here. *See also* Herbert Hovenkamp, Federal Antitrust Policy: The Law of Competition and its Practice § 10.4, p. 550 (5th ed. 2016) ("Clearly, if a seller freely permits the buyer to take or decline a second product there is not tie. The buyer must somehow be forced, or coerced, into accepting the tied product. This coercion could result from (1) an absolute refusal to sell the tying product without the tied product; (2) a discount, rebate or

*Collins*, 781 F.3d at 272 (defining "coercion" as "requiring the customer to buy product B when buying product A"); *Unijax*, 683 F.2d at 685 ("Actual coercion supporting a finding of a tying violation is present only if the manufacturer goes beyond persuasion and conditions its retailer's purchase of one product on the purchase of another product."); *Bob Maxfield*, 637 F.2d at 1037 (finding that coercion had not been proven in the absence of evidence that the defendant required the buyer to take the tied product in order to receive the tying product); Areeda ¶ 1752e ("[G]eneral threats inducing purchase of [a tied product] do not prove tying unless the threats took the form of refusing to sell the tying product to those who would not take the defendant's tied product.").

In other words, if a defendant threatens to withhold the tying product unless a buyer accepts the condition, and the defendant has the market power to make that threat meaningful, then the buyer is coerced to accept the condition. *Datagate, Inc. v. Hewlett-Packard Co.*, 60 F.3d 1421, 1423 (9th Cir. 1995) ("To accomplish [a tying arrangement], the competitor agrees to sell the tying product . . . only on the condition that its customers also purchase the tied product . . . . The competitor thus uses its market power in the tying product to coerce the customer into purchasing the tied product."). Thus, the pertinent question is whether the evidence shows that Simon refused or threatened to refuse to renew leases in the tying markets unless Ann Taylor signed a lease at University Park or agreed to stay out of Heritage Square. If so, then Simon's market power in the tying markets—the second element of a *per se* tying claim, which Simon has not challenged for the purposes of its motion—supplies the requisite force to coerce Ann Taylor to acquiesce to that threat.

---

other financial incentive given to buyers who also take the tied product; (3) technological design that makes it impossible to sell the tying product without the tied product.").

The Court finds that there is a genuine dispute of fact on that question. To begin with, Simon's negotiators denied adopting such a strategy or making such a threat to Ann Taylor, and Ann Taylor's negotiators denied that they received or were influenced by any such a threat, so summary judgment cannot be granted in Gumwood's favor on this issue. To create a factual dispute against that evidence, Gumwood relies primarily on a number of internal Simon documents and communications that reference plans to impose a tie and suggest that threats consistent with those plans had in fact been communicated to Ann Taylor. First, a document entitled "Ann Taylor Meeting Summary" dated August 15, 2006, outlines the following strategy: "Create leverage with renewals on more mature accounts . . . . We need a positive decision on University Park before we will move forward with any key renewals. Woodbury and Lenox would be prime centers to kill if the negotiations go south." [DE 129-8]. A similar document dated the following month contains the same language. [DE 128-25].

Other communications in that timeframe tend to corroborate Simon's adoption of that strategy and imply that such threats had been communicated to Ann Taylor. In internal emails in August and September 2006, one of Simon's negotiators wrote the following:

- "[T]hey [Ann Taylor] do have an executed lease, with [H]eritage, however, the developer has yet to satisfy the co tenancy. (expires in Dec of this year). We are putting the full court pressure on all others who are interested in the market[.] *I was very clear that their decision can and will jeopardize our willingness to proceed on new deals and renewals.*" [DE 129-33 (emphasis added)].

- "Scotti [Ann Taylor's lead negotiator] may be gone by year end. I do not know what he has or has not communicated to her [Kay Krill, Ann Taylor's CEO] about losing high producing stores (Lenox, Stanford, Woodbury … ) [i]f Mishawaka is not resolved to our satisfaction." [DE 129-32].

- "On the Ann Taylor front. Scotti has his ass in hot water and knows it. We have been very aggressive with him on cleaning up some existing problems prior to us addressing any key renewals so please hold off on woodbury. If he does not rectify his actions we are considering canceling[] 2 deals so his actions are not repeated." [DE 129-35]

13

- "I will still help where needed but in essence DS [David Simon] is trying to meet with Kay Krill. I don't believe John [Scotti] has told Kay the severity of the situation. If they go ahead with Heritage we're going to cancel Woodbury and Dadeland. Lose a pinky - take an arm!" [DE 129-34 (punctuation and capitalization modified for clarity)].

While these emails may fall short of a smoking gun, they at least permit an inference that Simon threatened to withhold leases in other properties if Ann Taylor proceeded with its store at Heritage Square or did not sign a lease at University Park. Notably, the first email notes that Simon "was *very clear* that [Ann Taylor's] decision can *and will* jeopardize [Simon's] willingness to proceed on new deals and renewals." [DE 129-33 (emphasis added)]. A subsequent email notes, "If they go ahead with Heritage we're going to cancel Woodbury and Dadeland." [DE 129-34]. The emails also imply that these threats had been communicated at least to Mr. Scotti, Ann Taylor's lead negotiator at the time, as they only express uncertainty as to how far he had communicated them within Ann Taylor. There is also evidence that these threats affected Ann Taylor's actions. Within days of these communications, Ann Taylor abruptly stopped construction of its store at Heritage Square, where it had a long-term lease, had already spent over one hundred thousand dollars in construction costs, and had previously planned to open by Christmas. *See Datagate*, 60 F.3d at 1426 (finding sufficient evidence of coercion where there was evidence that the defendant threatened to cease providing the tying product if the buyer purchased the tied product from a third party, and there was evidence that this threat impacted the buyer's decision).

In arguing that these statements do not constitute threats for these purposes, Simon cites to *Davis v. Marathon Oil*, 528 F.2d 395 (6th Cir. 1975). There, the defendant allegedly told the plaintiff, a gas station operator, that if he did not buy more of the tied product, "his lease might be cancelled." *Id.* at 401. The court found that this did not suffice to establish coercion because this statement was consistent with the defendant merely expressing its displeasure with the

plaintiff's performance as a distributor, and because "no express threats to cancel the lease were made." *Id.* at 401–02. But stating that Ann Taylor's decision can "and will" jeopardize the other leases, and that "[i]f they go ahead with Heritage we're going to cancel Woodbury and Dadeland," goes beyond the vague and tentative statement at issue in *Davis*. [DE 129-33, -34]. The statements also suggest that Simon intended for Ann Taylor to come away with the understanding that there would be consequences with its other leases if it stayed at Heritage Square. [DE 129-35 ("Scotti has his ass in hot water and knows it. We have been very aggressive with him on cleaning up some existing problems prior to us addressing any key renewals . . . .")]. Though there is room for a contrary interpretation, and a jury could find that those statements were never communicated to Ann Taylor in the first place, the Court finds that this evidence is sufficient to create a dispute of fact over whether Simon threatened to withhold the tying properties unless Ann Taylor agreed to its conditions in the tied market.

Simon also argues that the fact that Ann Taylor's representatives deny having been coerced is itself sufficient to grant summary judgment. The Court cannot agree. In support of this argument, Simon cites to *It's My Party*, 2016 WL 426085, and *Paladin*, 328 F.3d 1145. In both cases, the courts affirmed summary judgment on tying claims based on an absence of coercion, and noted during their discussions that even the alleged targets of the coercion denied being coerced. *It's My Party*, 2016 WL 426085, at *6; *Paladin*, 328 F.3d at 1161. However, neither court suggested that an admission of coercion is required, or that a denial of coercion is sufficient to negate a dispute of fact. Rather, the plaintiffs in both cases failed to provide evidence of any threats having been communicated, and the courts referenced the denials of coercion as an illustration of the absence of a dispute of fact. Here, there is evidence that threats were communicated and that they impacted Ann Taylor's decisions, so the fact that Ann Taylor's

representatives (whose credibility Gumwood also contests) deny the coercion only creates (or deepens) a dispute of fact. Accordingly, the Court finds that there is a genuine dispute as to the existence of a tie.

### 2. Harm to Competition

Simon next argues that Gumwood's claim fails because it has failed to present evidence of any harm to competition, such as evidence that Simon is charging above-market prices as a result of the tying. However, it is debatable whether harm to competition is a distinct element of a *per se* tying claim. The Supreme Court has never stated that proof of harm to competition is required. Likewise, the Seventh Circuit has on multiple occasions articulated the elements of a *per se* tying claim, and it has not included harm to competition among them. *Reifert*, 450 F.3d at 316; *Carl Sandburg*, 758 F.2d at 207. And in *Carl Sandburg*, the Seventh Circuit contrasted the *per se* framework against the rule of reason approach by noting that the latter "requires an inquiry into the actual effects of the agreement on competition." 758 F.2d at 210 n.5; *see also Datagate*, 60 F.3d at 1425 ("The foundational principle of *per se* antitrust liability is that some acts are considered so inherently anticompetitive that no examination of their impact on the market as a whole is required."); Herbert Hovenkamp, Federal Antitrust Policy: The Law of Competition and Its Practice § 10.1 p. 535 (5th ed. 2016) ("If a tying arrangement is really a *per se* violation of the antitrust laws, as the Supreme Court has often stated, then a separate analysis of anticompetitive effects is peculiar. The whole point of *per se* analysis is to avoid expensive individualized inquiries concerning competitive effects of particular arrangements."). Further, at least one district court in this circuit has stated that "[u]nder a *per se* rule analysis, a plaintiff is not required to prove any anti-competitive consequences of a defendant's activity . . . ." *KFC Corp. v. Marion-Kay Co., Inc.*, 620 F. Supp. 1160, 1169 (S.D. Ind. 1985).

As Simon notes in its reply brief, some circuits have required plaintiffs to prove harm to competition as an element of a *per se* tying claim. The Second Circuit first included that requirement in *Yentsch v. Texaco, Inc.*, 630 F.2d 46, 57 (2d Cir. 1980). However, the court's analysis of that element looked to whether there was any proof of "foreclosure of competition in the tied product market," meaning whether the tying affected any buyers' decisions as to whether to buy the tied products from a competitor instead of the defendant. *Id.* at 57–58 ("As to anticompetitive effects in the tied product markets, the question is whether . . . competitors were foreclosed from selling to [buyers] because of [the defendant's] policies."). The Seventh Circuit essentially incorporates that factor into the third element of its test—whether a not-insubstantial amount of commerce is affected. As the Seventh Circuit stated in *Reifert*, "The third element of the [*per se* tying] test states that a tying arrangement violates antitrust law only if 'a substantial volume of commerce is foreclosed' because of the tie." 450 F.3d at 317 (quoting *Jefferson Parish*, 466 U.S. 2)).

*Fox Motors, Inc. v. Mazda Distribs. (Gulf), Inc.*, which Simon also cites on this point, likewise focused on whether the practice in question ever caused buyers not to purchase the tied products from competitors. 806 F.2d 593, 958 (10th Cir. 1986) ("The record contains no indication that the alleged tying arrangement . . . influenced the level of dealer purchases from different manufacturers."); *see also Driskill v. Dallas Cowboys Football Club, Inc.*, 498 F.2d 321, 323 (5th Cir. 1974) (also cited by Simon, and holding that the effect-on-competition element was not met where there were no other competitors in the tied market). Thus, even in circuits that include harm to competition as an element of a *per se* tying claim, the substance of the analysis is still largely on par with the Seventh Circuit's analysis, and looks more generally to whether buyers might have purchased the tied products from a competitor absent the tying, not

to whether there is evidence of actual economic effects such as above-market prices in the tied markets, as Simon suggests is required here. *See Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 585 F.2d 821, 835 (7th Cir. 1978) (stating that in a *per se* tying analysis, "we are not free to inquire whether such tying in any given case injures market competition," but that there must be at least some "potential to foreclose access to the tied product market").

Therefore, the Court proceeds under the analysis set forth by the Seventh Circuit for a *per se* tying claim. In that framework, the existence of harm to competition is encompassed in the element of whether the tie affects a not-insubstantial amount of commerce in the tied product. *Reifert*, 450 F.3d at 317. The Seventh Circuit has further stated that "[t]his element can be broken into two sub-questions: (1) Is there at least one competitor in the tied product market other than the [defendant]; and (2) Is the quantity of interstate commerce affected not-insubstantial?" *Id.* at 318. As to the first sub-question, Heritage Square could qualify as a competitor to University Park in the tied market of Mishawaka. And as to the second sub-question, Simon concedes that there is at least a dispute of fact as to whether a not-insubstantial amount of commerce has been affected. [DE 148 p. 19 ("There is a genuine dispute about whether a substantial volume of commerce was foreclosed.")]. Accordingly, Gumwood has satisfied its burden on this element at this stage.

Finally, Simon argues that the Court should not extend the *per se* tying analysis to the context of portfolio negotiations, where parties negotiate large numbers of leases as a package. The tying theory there would apparently be that if the parties agree that nothing is final until everything is final, then every item in the negotiation is conditioned on every other item. Simon argues that there are pro-competitive justifications for engaging in portfolio negotiations, and that this arrangement is dissimilar from other arrangements that have been subjected to *per se*

illegality, so the *per se* analysis should not apply. However, this argument appears to have been raised in anticipation of an argument that Gumwood never actually made. Gumwood does not argue that the portfolio negotiation itself constitutes a tying arrangement (though Dr. Frech, Gumwood's expert, did at his deposition), and the Court agrees that it does not. Portfolio negotiations may facilitate a tying arrangement, but negotiating a package deal does not create a tie until a party conveys that the tied product *must* be a part of the package or they will withhold the tying product. Thus, as discussed above, Gumwood must show that Simon threatened to refuse to lease other properties depending on Ann Taylor's decision on University Park and Heritage Square, not simply that the parties negotiated multiple properties together or that Ann Taylor's decision on one might have affected the terms of others.

To the extent that Simon argues that the *per se* analysis should not apply even where such a threat is present, though, the Court disagrees. That type of coercion is within the heartland of cases that examine tying claims under the *per se* analysis. *E.g.*, *It's My Party*, 2016 WL 426085; *Paladin*, 328 F.3d 1145; *Datagate*, 60 F.3d 1421; *Unijax*, 683 F.2d 687; *Bob Maxfield*, 637 F.2d 1033. Moreover, though the Court agrees that portfolio negotiations in general are likely to have many desirable effects, Simon has not articulated any competitive justification for threatening a customer to prevent them from doing business with a competitor, and the Court sees no reason why the *per se* analysis should not apply in that context. *Sheridan*, 530 F.3d at 593 ("The Court has not discarded the tying rule, and we have no authority to do so.").

## B.    Statute of Limitations

Simon next argues that Gumwood's claims are barred by the statute of limitations. A civil antitrust action is barred by the statute of limitations unless it is "commenced within four years after the cause of action accrued." 15 U.S.C. § 15b; *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321 (1971). Gumwood filed its complaint in this action on June 29, 2011, so any

claim that accrued prior to June 29, 2007 is barred. "Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *Zenith*, 401 U.S. at 336. Gumwood alleges that Simon's tying activity began in 2006 and began harming Heritage Square well before June 29, 2007, including by causing Ann Taylor to discontinue its construction at Heritage Square in August 2006 and to decline to sign an otherwise fully-negotiated lease amendment in April 2007 that would have required it to open its store at Heritage Square. The statute of limitations could thus pose a significant obstacle to Gumwood's claims.

To avoid that result, Gumwood invokes the continuing violation doctrine. "Antitrust law provides that, in the case of a 'continuing violation,' say, a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, 'each overt act that is part of the violation and that injures the plaintiff,' *e.g.*, each sale to the plaintiff, 'starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times.'" *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (quoting 2 P. Areeda & H. Hovenkamp, Antitrust Law ¶ 338b (rev. ed. 1995)); *see also Zenith*, 401 U.S. at 338 ("In the context of a continuing conspiracy to violate the antitrust laws, . . . each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act."). "An overt act that restarts the statute of limitations is characterized by two elements: (1) it must 'be a new and independent act that is not merely a reaffirmation of a previous act'; and (2) it must 'inflict new and accumulating injury on the plaintiff.'" *DXS, Inc. v. Siemens Medical Systems, Inc.*, 100 F.3d 462, 467 (6th Cir. 1996) (quoting *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 238 (9th Cir. 1987)); *accord Lehman v. Lucom*, 727 F.3d 1326, 1331 (11th Cir.

2013); *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1088 (10th Cir. 2006);

*Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 902 (7th Cir. 2004); *Varner v. Peterson Farms*, 371 F.3d 1011, 1019 (8th Cir. 2004).

In its brief, Gumwood does not acknowledge this analytical framework for continuing violations. Instead, it cites primarily to *Taylor v. Meirick*, 712 F.2d 1112 (7th Cir. 1983), which addressed a different conception of the continuing violation doctrine in the context of a copyright claim. There, the Seventh Circuit held that "the statute of limitations does not begin to run on a continuing wrong till the wrong is over and done with." *Id.* at 1118. As a result, the plaintiff's claim for a series of copyright violations was timely where the defendant's conduct continued into the limitations period, even though it began outside the limitations period. *Id.* And perhaps more importantly, the court permitted the plaintiff to reach back and recover damages that occurred prior to the limitations period because those damages were part of the same continuing violation. *Id.* at 1119.

To the extent Gumwood attempts to rely on *Taylor* to argue that it need not prove new acts and injuries within the limitations period, *Taylor* does not support that proposition.[3] The court there found that the defendant was accountable for continued sales of the infringing product within the limitations period, *id.*, so it did not suggest that a plaintiff could recover even when a continuing wrong extends into the limitations period but inflicts no new injuries in that

---

[3] For what it's worth, *Taylor* has arguably been narrowed by the Seventh Circuit, *e.g.*, *Limestone Dev. Corp. v. Village of Lemont, Ill.*, 520 F.3d 797, 800–802 (7th Cir. 2008); *CSC Holdings, Inc. v. Redisi*, 309 F.3d 988, 992–93 (7th Cir. 2002), and has been criticized by other district courts in this circuit to the extent that at least one district court has refused to follow it even in the copyright context, finding itself "powerfully convinced" that the Seventh Circuit would reverse *Taylor* once given the chance, *Leventhal v. Schenberg*, 917 F. Supp. 2d 837, 845–46 (N.D. Ill. 2013). *See also Champion Labs., Inc. v. Cent. Ill. Mfg. Co.*, No. 14 C 9754, 2016 WL 164364, at *4 (N.D. Ill. Jan. 14, 2016) (describing the limitations and criticisms of *Taylor*, but nonetheless following its holding in a copyright case).

span. Moreover, in the antitrust context, courts have widely and quite uniformly held that in order for continuing violations to trigger new limitations periods, there must be a new and independent overt act that inflicts new and accumulating injury on the plaintiff. *Klehr*, 521 U.S. at 189; *Lehman*, 727 F.3d at 1331; *Champagne Metals*, 458 F.3d at 1088; *Xechem*, 372 F.3d at 902; *Varner*, 371 F.3d at 1019; *DXS*, 100 F.3d at 467; *Pace Industries*, 813 F.2d at 238; *see also* Areeda & Hovenkamp, Antitrust Law ¶ 320c6 (4th ed. 2014) ("Of course, if the damages all occurred more than four years earlier, the plaintiff is time-barred notwithstanding continuation of the defendant's violation."). To the extent *Taylor* says otherwise, it does not apply in this context.

    *Taylor's* effect in this case, if any, would thus not be on whether Gumwood's claims are barred, but on whether Gumwood can recover damages caused by acts that occurred prior to the limitations period, in that *Taylor* permitted the plaintiff to recover damages for the entire course of conduct. But there again, Gumwood runs into the problem that this proposition is contrary to the great weight of authority in antitrust cases. *E.g.*, *Klehr*, 521 U.S. at 189 ("But the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period."); *Xechem*, 372 F.3d at 902; *Stolow v. Greg Manning Auctions Inc.*, 80 F. App'x 722, 725 (2d Cir. 2003) ("Stolow cannot recover for the loss of [his company] or other injuries he allegedly suffered before April 4, 1998 (four years before he filed this lawsuit) because his claim that the continuing nature of the alleged illegal conduct tolled the statute of limitations is without merit. . . . Although Stolow refers to *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), which treated a 'hostile work environment' claim as a single 'unlawful employment practice' under Title VII for statute of limitations purposes, nothing suggests that the Supreme Court intended

that decision to displace these well-established antitrust and RICO principles."); Areeda ¶ 320c6

("Even in the case of the continuing conspiracy or violation, . . . plaintiffs are ordinarily limited

to damages for the four years immediately preceding the filing of their lawsuit.").

As Simon notes, this is illustrated by the very cases Gumwood cites that apply the

continuing violation doctrine in the antitrust context, which hold that the plaintiff may only

recover damages that accrued within the limitations period, not damages that were caused by the

same course of conduct but that predated the limitations period. *Hanover Shoe, Inc. v. United

Shoe Mach. Corp.*, 392 U.S. 481 (1968) (allowing the plaintiff to bring an antitrust claim in 1955

for conduct that began in 1912, but permitting recovery of only the damages that accrued within

the limitations period); *Smith*, 2012 WL: 27718, at *3 n.2 (denying a motion to dismiss since the

continuing violation extended into the limitations period, but noting that "[a]ny harm that accrues

after the tolling of the statute of limitations periods but that is associated with an overt act that

occurred prior to the limitations period is not remediable"). The Seventh Circuit has also

expressly rejected extending *Taylor's* damages theory into the RICO context, *McCool v. Strata

Oil Co.*, 972 F.2d 1452, 1466 (7th Cir. 1992), which employs the same limitations principles as

antitrust law, *Klehr*, 521 U.S. at 190 (citing this holding from *McCool* as applying in both the

RICO and antitrust contexts); *see also Limestone Dev. Corp.*, 520 F.3d at 800–802. Thus, to

decide whether Gumwood's claims are barred in their entirety, as would be required to justify

summary judgment, the Court considers, first, whether Simon engaged in any new and

independent overt acts within the limitations period, and second, whether those acts inflicted any

new and accumulating injury on Gumwood.

### 1.    New and Independent Act

First, to start a new limitations period, an overt act must "be a new and independent act

that is not merely a reaffirmation of a previous act." *DXS*, 100 F.3d at 467 ("Even when a

plaintiff alleges a continuing violation, an overt act by the defendant is required to restart the statute of limitations and the statute runs from the last overt act."). As some circuits have articulated this rule, overt acts must be more than the "abatable but unabated inertial consequences of some pre-limitations action" in order to trigger a new limitations period. *Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 600 (6th Cir. 2014); *Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 517 F.2d 117, 128 (5th Cir. 1975). Thus, where a party makes an "'irrevocable, immutable, permanent and final'" decision prior to the limitations period, subsequent acts within the limitations period that simply reflect that prior decision will not restart the clock. *Champagne Metals*, 458 F.3d at 1090 (quoting *Hennegan v. Pacifico Creative Serv., Inc.*, 787 F.2d 1299, 1301 (9th Cir. 1986)).

Conversely, when a party decides to embark on an unlawful course of conduct prior to the limitations period, but that initial decision "require[s] further action" to implement, or a party's actions within the limitations period "manifest[] a commitment to renewing and enforcing" a prior decision or agreement, those subsequent actions will restart the limitations period. *Id.* at 1089; *see also DXS*, 100 F.3d at 468 (finding that subsequent acts to implement a previously-announced but unenforced policy restarted the limitations clock where they were not "compelled by" the policy announcement and were not "merely reaffirmations of" the policy); *Midwestern Mach. Co., Inc. v. Nw. Airlines, Inc.*, 392 F.3d 265 (8th Cir. 2004) ("[A] continuing violation theory is based on an initial action that violates the antitrust laws followed by injuries caused by illegal actions *designed to implement and effectuate* the initial violation."). In the context of a tying arrangement, this typically means that a plaintiff must show that the defendant "'had the ability to and actually did enforce the tie' during the limitations period." *Eichman v.*

*Fotomat Corp.* 880 F.2d 149, 160 (9th Cir. 1989) (quoting *Airweld, Inc. v. Arco, Inc.*, 742 F.2d 1184, 1190 (9th Cir. 1984)); *Smith*, 2012 WL 27718, at *3 (same).

Here, as Simon argues, the alleged tying activity began prior to June 2007, which suggests that Simon had decided prior to that point (if at all) to require Ann Taylor to sign a lease at University Park or to stay out of Heritage Square in order to retain its leases at the other Simon properties. But there was nothing final or irrevocable about any of Simon's actions prior to the limitations period. As Simon's continued interactions with Ann Taylor revealed, any tying arrangement was tenuous at best, and it took considerable maneuvering and prodding over the ensuing period for Simon to keep Ann Taylor from proceeding at Heritage Square and to cause it to sign a lease at University Park. Nor did Ann Taylor take any action that irrevocably committed it to the tying arrangement prior to the limitations period. It neither terminated its lease with Heritage Square nor signed a lease at University Park until well within the limitations period. Thus, Simon could not simply sit idly while the inertial consequences of its previous threats played out. To the contrary, the parties' negotiations proceeded in fits and starts, and Simon had to consistently apply pressure to Ann Taylor and maintain the tie to ensure that Ann Taylor would comply.

The nature of the relationship between Ann Taylor and Simon relative to Gumwood makes this clear. This was not a case where two parties with mutually aligned interests agreed not to do business with a plaintiff, such that the initial agreement between those parties can be considered final and the subsequent acts within the limitations period merely reflect that prior decision. *E.g.*, *Kaw Valley Elec. Coop. Co., Inc. v. Kan. Elec. Power Coop., Inc.*, 872 F.2d 931, 933 (10th Cir. 1989) (finding an action time-barred where a cooperative decided prior to the limitations period not to do business with non-members); *AMF, Inc. v. Gen. Motors Corp.*, 591

F.2d 68 (9th Cir. 1979) (similar). The tying arrangement here would have been adverse to Ann Taylor's interests, as it constrained Ann Taylor's ability to freely consider and choose among competing centers. Thus, in the absence of a formalized agreement that Simon could enforce against Ann Taylor, the tying arrangement required continuing action by Simon to keep Ann Taylor aligned.

The Tenth Circuit's decision in *Champagne Metals* involved a similar scenario. There, a group of the plaintiff's competitors conspired to harm the plaintiff by pressuring the plaintiff's suppliers not to do business with it. 458 F.3d at 1089. But like Simon's initial decision to impose a tying arrangement, the initial decision among the competitors in *Champagne Metals* did not itself have any effect on the plaintiff. *Id.* Rather, the competitors had to take further action to implement that decision by coercing third parties, the suppliers, not to do business with the plaintiff. *Id.* Thus, the acts that the competitors took within the limitations period to keep the suppliers from doing business with the plaintiff were sufficiently new and independent to restart the statute of limitations. *Id.* at 1089–90 (noting also that the plaintiff could seek to recover damages "for those acts" that occurred "within the limitations period"); *see also Hennegan*, 787 F.2d at 1300–01 (finding a continuing violation where a souvenir shop's competitors coerced third parties, tour operators, to steer their tours away from the plaintiff's shop, and actions in furtherance of that arrangement continued into and caused harm within the limitations period).

Likewise here, Simon could not unilaterally deprive Heritage Square of its tenants. Rather, it could only impact Heritage Square by influencing the actions of those third parties, including Ann Taylor. *See Champagne Metals*, 458 F.3d at 1089 (distinguishing *Kaw Valley*, where the defendants' refusals to deal with the plaintiff did not restart the limitations period, on the basis that "the agreeing parties [in *Kaw Valley*] had exclusive control over the input they

sought to deny to the plaintiff; a decision not to supply that input required no further action"). And though Simon allegedly began pressuring Ann Taylor in 2006, it was not until mid-2008 that Ann Taylor finally signed a lease at University Park. That lease itself would constitute a new, independent overt act in furtherance of the tying arrangement, as it was the culmination of the alleged tying and was not an inevitable consequence of any previous acts. It also took concerted and renewed effort by Simon into 2008 to secure the University Park lease, and those various acts could also qualify as new overt acts. [*E.g.*, DE 128-36; 129-43].

There were other potential overt acts within the limitations period, too. For example, there is evidence that around August 2007, Ann Taylor and Simon entered an agreement by which Ann Taylor agreed not to open any stores in centers that competed with Simon properties. Multiple emails reference such an agreement and note that the parties were working on how to document it. [*E.g.*, DE 129-43 "Yes, we agreed not to go into the other project . . . ."); 129-44 ("As the 'new kid on the block', Buck [Sappenfield of Ann Taylor] has said all the right things – ie. no more AT's [Ann Taylors] opening in our backyard."); 128-33 (noting among the "open items" to be addressed between Ann Taylor and Simon: "Discussion and understanding as to how we should document AT's agreement not to go into the markets where they've turned down opportunities with us."). That agreement is a plausible result of Simon's tying threats and could encompass Heritage Square, and could thus be another new and independent overt act as part of the tying arrangement.

Moreover, throughout this period, Simon continued to insist on engaging in a single, global negotiation rather than agreeing on individual properties. [*E.g.*, DE 128-27 ("As it relates to AT, . . . we agreed only to hold up renewals . . . ."); 128-32; 129-36 ("In a meeting yesterday with David and Rick, they reiterated their direction not to sign any leases (new or renewal)

with . . . Ann Taylor unless and until we finish our packages with them."); 129-38 ("We were holding all the deals until they were all complete."); 129-39 (noting that Simon had been holding off on renewing certain leases for about a year as of February 2008); 129-41 ("until things are settled with AT, we should not be pursuing the signing of this lease.")]. As Simon argues, there is nothing inherently improper about that practice, and it is not sufficient to establish a tie. However, it was still a necessary step to maintain a tying arrangement under these circumstances, since Simon could not tie properties together if it negotiated and executed each lease individually. Each of those refusals to renew leases on the tying properties or to negotiate them apart from the tied properties could thus constitute new overt acts, as they continued to implement the tying arrangement. Therefore, the Court finds that there is evidence from which a jury could find that Simon took overt acts within the limitations period that could have triggered a new statute of limitations.

### 2.   New and Accumulating Injury

The more difficult question on this record comes on the second element, which is whether Gumwood was actually harmed by any overt acts that took place within the limitations period. For overt acts to restart the limitations period, they must inflict "new and accumulating injury on the plaintiff." *DXS*, 100 F.3d at 467 (quoting *Pace Indus.*, 813 F.2d at 238); Areeda ¶ 320c6 ("Of course, if the damages all occurred more than four years earlier, the plaintiff is time-barred notwithstanding continuation of the defendant's violation."). However, after the negotiations between Gumwood and Ann Taylor for the lease amendment fell through in April 2007, there were never any further concrete plans to open the store at Heritage Square that could have been interrupted by any tying arrangement; the store essentially remained in limbo until Ann Taylor signed a lease and later opened its store at University Park. And as a matter of antitrust law, "when a purchaser is 'forced' to buy a product he would not have otherwise bought

even from another seller in the tied product market, there can be no adverse impact on competition because no portion of the market which would otherwise have been available to other sellers has been foreclosed." *Jefferson Parish*, 466 U.S. at 16; *Reifert*, 450 F.3d at 318 ("Forcing a buyer to purchase a product he otherwise would not have purchased is insufficient to establish the foreclosure of competition."). Thus, if Ann Taylor had decided prior to the limitations period that it was not going to open a store at Heritage Square, as Simon argues, and Simon then "forced" Ann Taylor to open at University Park when it would not have otherwise opened with any other competitors in the market, the subsequent forcing will be of no antitrust concern and will not revive Gumwood's claim.

However, the Court finds that there is sufficient evidence from which a jury could find that Ann Taylor had not conclusively decided prior to the limitations period not to open at Heritage Square, and that it may have opened its store there if not for Simon's continued tying. To begin with, Ann Taylor still had a binding ten-year lease at Heritage Square that it was unable to terminate. It had also spent over one hundred thousand dollars in construction costs building its store at Heritage Square, so it had an investment in that location. Further, because the co-tenancy provision in its lease had not been (and could not be) met, Ann Taylor would have been able to pay significantly reduced rent at Heritage Square, saving it twenty percent or more on rent each year.[4] Under those circumstances, Ann Taylor would have had the ability to return to Heritage Square rather easily had Simon not continued to persist in the tying arrangement, and it would have had incentives to do so, too.

---

[4] Other stores at Heritage Square whose co-tenancy provisions were not met opened anyway, possibly for that reason.

There is also evidence that Ann Taylor believed that Heritage Square was the best location for it even after Simon's tying activity began. In a March 17, 2007 email, one of Ann Taylor's representatives stated: "I'm having problems at heritage. . . . .feeling the pre[]ssure. The sad thing is we all believe that is where we should be." [DE 128-24]. He also explained at his deposition, "We knew this was the right site and market for us to be in or I felt that was the right market to be in . . . ." [DE 129-1 p. 13]. Though that was still prior to the limitations period, it is notable in that it shows that even after Simon's initial salvo, which included the threats noted above and even a meeting between Simon's and Ann Taylor's CEOs, Ann Taylor was still interested in opening a store at Heritage Square and may have preferred that location to University Park. A jury could infer that Ann Taylor's preference remained the same three months later when the limitations period began.

Simon also notes that Mr. Sappenfield of Ann Taylor testified that as of March 2007, Ann Taylor was putting together an action plan to terminate the lease at Heritage Square because "[t]he division was not wanting to go forward with a store in the shopping center." [DE 132-19 (stating also, "The only caveat is that we already had spent $100,000 on the store and the easiest thing would have been to go forward but we didn't think that the store would be successful.")]. Yet, the following month, Ann Taylor began negotiating with Gumwood over a second amendment to its lease under which it would have immediately resumed construction and opened its store at Heritage Square. Though Ann Taylor did not go forward with that plan, either, this illustrates the back-and-forth nature of Ann Taylor's intentions at Heritage Square.

In addition, though there were never any new concrete plans for Ann Taylor to open at Heritage Square after April 2007, there was no formal or irrevocable decision to terminate Ann Taylor's relationship with Heritage Square at that time. In May 2007, an Ann Taylor

representative told a Heritage Square representative "that with reference to Ann Taylor Loft, that they [Ann Taylor] still had many issues to overcome with Simon before they could determine if they will move forward with us." [DE 151-7]. Internal Ann Taylor communications in July 2007 also suggest that Ann Taylor had no present intention to open a store at Heritage Square, but they were equivocal as to whether Ann Taylor had made any final decision not to ever open at Heritage Square. [DE 151-10 (stating that the deal is "on hold" and that they "will determine if the deal should be killed shortly")]. *See Xechem*, 372 F.3d 901–02 (finding that an action was not time-barred even though the project in question had been placed "on permanent hold" prior to the limitations period, since that could be interpreted as merely a decision not to act at that particular time, not a final decision to never do so, and noting that "'on hold' itself implies the possibility of change"). And in February 2008, Ann Taylor inquired as to the status of Heritage Square and indicated to a Gumwood representative that they "still didn't know if [they] could open with" Heritage Square, but that they were "looking for an opportunity to do that." [DE 132-62 p. 7].

Gumwood's corporate representative also testified that her discussions with Ann Taylor about opening at Heritage Square continued throughout this period, and even continued after Ann Taylor signed a lease at University Park. [DE 151-11 ("They continued to talk with us, that there could be an opening -- or that they could potentially open. So that's why we kept the conversations alive.")]. Ann Taylor never communicated to Gumwood during that period that the deal was dead. [*Id.*] In fact, an Ann Taylor representative told her in December 2008 that they still were not sure whether Ann Taylor was going to enter the market, and that he would be back in touch with her in January 2009. [*Id.*] This indicates that even after Ann Taylor signed a lease with University Park in July 2008, it was trying to keep its options open as much as possible,

which is inconsistent with Ann Taylor having made a final decision prior to June 29, 2007, when the limitations period began.

Granted, there is other evidence that by the time Ann Taylor finally signed a lease at University Park, it had already decided not to open at Heritage Square and was deciding only between opening at University Park or not opening in Mishawaka at all. [*E.g.*, DE 129-43 ("Yes, we agreed not to go into the other project, but the division does not want to go to the [University Park] mall either. They will just not have a store in the market.")]. But Ann Taylor's position at that time could be viewed as a product of Simon's continued maintenance of the tying arrangement, too, or of the agreement around August 2007 for Ann Taylor not to open any stores "in [Simon's] backyard." [DE 129-44; 128-33]. Ann Taylor may have preferred not being in the market to opening a store at University Park, but it may have also preferred opening a store at Heritage Square to both of those options. [*See* DE 128-24; 129-1 p. 13]. The tying arrangement took that option off the table at the time, but that does not mean that if Simon did not continue to maintain its tying requirement, Ann Taylor would not have returned to Heritage Square. And given the other evidence noted above that Ann Taylor may have still considered opening a store at Heritage Square within the limitations period, the Court finds that there is a genuine dispute of fact on this question. Accordingly, the Court cannot grant summary judgment on the basis that the claims are barred in whole by the statute of limitations.

### 3. Collateral Estoppel

Finally, Simon argues that Gumwood should be collaterally estopped from contesting that it knew by April 2007 that it had suffered an injury as a result of Simon's conduct. Simon bases this argument on the dismissal of a tortious interference claim Gumwood brought against Simon in state court. However, as Simon notes in its reply brief, Gumwood does not contest that it was aware of that injury by April 2007, so the Court need not address the collateral estoppel

argument. Moreover, that fact has no impact on the continuing-violations analysis above as to these antitrust claims[5]—that Gumwood cannot recover any damages for injuries it suffered prior to the limitations period does not mean it cannot recover for injuries caused by conduct within the limitations period that caused new and accumulating harm, if it can make that showing.

## C.      Collateral Source Doctrine

Finally, Gumwood has moved for summary judgment to preclude Simon from offering evidence to reduce Gumwood's damages under the collateral source doctrine, under which benefits conferred on a plaintiff by third parties cannot be used to reduce the damages owed by a defendant. Broadly speaking, Gumwood's expert calculated damages by determining the total loss in value to Heritage Square attributable to Simon's conduct. He first determined that Heritage Square was worth either $34.3 or $41.0 million prior to the events at issue here. He then determined that it was worth $11.0 million as of November 2010. After controlling for a substantial drop in value due to the recession, which accounted for about half of the losses, the expert concluded that the loss in value of Heritage Square attributable to Simon's conduct was either $11.0 or $16.7 million.

Meanwhile, Simon's expert contends that if damages are measured based on a change in value at all,[6] they should be measured by the change in the value of Gumwood's interest in Heritage Square, not the change of value of Heritage Square itself. Simon's expert notes that Heritage Square was pledged as security for a $33.5 million non-recourse loan for its

---

[5] In fact, the same state court denied Simon's motion to dismiss Gumwood's state antitrust claims as untimely. [DE 151-2, -3].

[6] She contends that the proper method is actually to calculate the amount of reduced rent that Heritage Square collected as a result of the loss of Ann Taylor as a tenant. After subtracting certain costs and expenses, she arrives at a net difference of $28,739 in loss to Gumwood based on Ann Taylor's absence.

construction. She then calculates Gumwood's interest in Heritage Square as the difference between Heritage Square's value prior to these events and the amount of the loan, which she places at either $4.5 or $12.8 million based on Gumwood's expert's calculations. She thus contends that those amounts were the most that Gumwood stood to lose (much or all of which may have been lost due to the recession and other factors), and that any additional loss in value would have been sustained by the lender when it took ownership of Heritage Square through a deed in lieu of foreclosure and Gumwood's obligation to repay the loan was released. Gumwood objects to this calculation, arguing that it is a backdoor way of introducing evidence of loan forgiveness, which Gumwood argues would be barred by the collateral source doctrine.

Typically, the collateral source doctrine applies where a plaintiff receives insurance payments or some other benefits that are triggered by or compensate the plaintiff for the injury in question. *E.g.*, *ADM Investor Servs., Inc. v. Collins*, 515 F.3d 753, 755 (7th Cir. 2008); *Perry v. Larson*, 794 F.2d 279, 285–86 (7th Cir. 1986); *see* Restatement (Second) of Torts § 920A ("Payments made to or benefits conferred on the injured party from other sources are not credited against the tortfeasor's liability, although they cover all or a part of the harm for which the tortfeasor is liable."). In those circumstances, the collateral benefits received by the plaintiff cannot be used to reduce the damages owed by the defendant. *Collins*, 515 F.3d at 755; *Perry*, 794 F.2d at 285–86. For example, the defendant in *Collins* incurred a debt by making trades on margin, and that debt was guaranteed by a third-party broker. *Collins*, 515 F.3d at 755. When the plaintiff made a margin call that the defendant could not satisfy, the guarantor paid the plaintiff a portion of the defendant's outstanding debt pursuant to its guarantee. *Id.* The court held that the payment did not reduce the damages that the defendant owed to the plaintiff, stating, "That a third party reimburses part of a loss does not disable the injured person from recovering under

tort or contract law." *Id.* Similarly, in *Molzof v. United States*, 6 F.3d 461 (7th Cir. 1993), the

Seventh Circuit considered an award of future medical expenses in a tort action. There, even

though the plaintiff was entitled to free medical care for life because of his prior military service,

the court held that the plaintiff was still entitled to receive over $1 million in damages for the

value of his future medical care. *Id.* at 464–65. While the injury left the plaintiff no worse off

financially relative to his future medical expenses—both before and after the injury, he was

entitled to free medical care—the collateral source rule prevented his recovery from being

reduced on that basis. *Id.*

The circumstances here fit rather oddly, if at all, into the framework of the collateral

source doctrine, though. As Simon argues, its expert did not invoke loan forgiveness as such as

the basis for her opinion. However, her opinion relies on the premise that Gumwood had no

further obligation to repay the loan once the lender took ownership of Heritage Square. If

Gumwood remained obligated for the full amount of the loan, it would certainly be damaged in

the full amount of the loss of value of Heritage Square, as that would have directly reduced its

ability to satisfy the loan and the lender could still pursue Gumwood for the remaining balance.

Having instead negotiated a non-recourse loan, Gumwood essentially transferred some of the

risk of loss of value of Heritage Square to its lender (for which the lender was presumably

compensated), much as a homeowner might purchase home insurance to transfer some of the risk

of damage to its home to an insurer, in which case the insurance payments would not reduce the

plaintiff's recovery. By that comparison, the collateral source doctrine might mean that the

contractual forgiveness of the outstanding loan balance at the time the lender accepted the deed

in lieu of foreclosure will not impact the damages to which Gumwood is entitled. However,

neither party has cited any case applying the collateral source doctrine in this unique factual

circumstance or suggesting that a non-recourse loan can provide a form of collateral benefit.[7] And for that matter, Simon has cited no authority that the existence of a loan on a property or the terms of that loan should affect a plaintiff's ability to recover damages for harm to that property in the first place, so resort to the collateral source doctrine may be unnecessary.

Moreover, the thrust of Simon's argument is essentially that much of the claim for the loss of value of Heritage Square belongs to the lender because the lender bore much of the risk and realized the loss when it took ownership of the property. Yet Gumwood also represents that when the lender accepted the deed in lieu of foreclosure, the lender permitted Gumwood to retain any claim against Simon relative to Heritage Square. Thus, if the damages in question are recoverable by either Gumwood or the lender, and the lender has relinquished its claim to Gumwood, Gumwood might be entitled to recover those damages either way. Finally, Gumwood argues that the loan was not fully non-recourse, as some of its principals had to make certain personal guarantees. However, Gumwood does not indicate how the personal obligations of the partners should affect the damages recoverable by the partnership, if at all, or how that would be a collateral benefit to Gumwood.

Given the uncertainties of these various moving parts, and because neither party has presented any authority applying the collateral source doctrine in these unique circumstances, the Court cannot conclude at this time that Gumwood is entitled to summary judgment as to the application of the collateral source doctrine. However, these issues bear further consideration,

---

[7] States also take various approaches as to whether plaintiffs' recoveries should be reduced where they are able to negotiate discounts on expenses incurred as a result of the injury in question. Those cases seem inapplicable here, though, where both the loan and its non-recourse terms were in effect prior to the injury.

and the parties may renew or present additional arguments on these issues as appropriate in advance of trial.

## IV.  CONCLUSION

For the foregoing reasons, the parties' cross motions for summary judgment [DE 127, 130] are each DENIED. Simon's motions to strike [DE 156, 159] are also DENIED as moot. Finally, Simon's motion for oral argument [DE 135] is DENIED as unnecessary at this time in light of the depth and quality of the parties' briefs.

SO ORDERED.

ENTERED:  March 18, 2016

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court