UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| GUMWOOD HP SHOPPING PARTNERS, L.P., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 3:11-CV-268 JD |
| SIMON PROPERTY GROUP, INC., | ) ) | |
| Defendant. | ) | |

## <u>OPINION AND ORDER</u>

This is an antitrust case in which the plaintiff, Gumwood HP Shopping Partners, L.P.,
asserts claims for a restraint of trade, monopolization, and attempted monopolization against
Simon Property Group, Inc., the defendant. In short, Gumwood claims that Simon improperly
prevented retailers from leasing at Gumwood's new shopping center, Heritage Square, which
was poised to compete against Simon's established University Park Mall and a new outdoor
shopping area that was under construction at that mall. The Court has denied cross motions for
summary judgment and this case is set for trial.

Now before the Court are motions filed by each party seeking to strike expert testimony
from the opposing party's expert witness. In this order, the Court addresses the aspects of those
motions that relate to the experts' opinions concerning liability. For the reasons that follow, both
motions are granted in part and denied in part. The Court will address the aspects of those
motions that relate to the experts' damages opinions in a separate order.

# I. STANDARD OF REVIEW

Rule 702 governs the admission of testimony by expert witnesses. Under that rule, a witness "who is qualified as an expert by knowledge, skill, experience, training, or education" may offer an opinion if the following criteria are met:

    (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

    (b)    the testimony is based on sufficient facts or data;

    (c)    the testimony is the product of reliable principles and methods; and

    (d)    the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. A court has a gatekeeping role to ensure that expert testimony meets these criteria. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993); *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834–35 (7th Cir. 2015). As the Seventh Circuit has emphasized, though, a court does not assess "'the ultimate correctness of the expert's conclusions.'" *Textron*, 807 F.3d at 834 (quoting *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013)). Rather, a court must focus "solely on principles and methodology, not on the conclusions they generate." *Schultz*, 721 F.3d at 432 (quoting *Daubert*, 509 U.S. at 595). "So long as the principles and methodology reflect reliable scientific practice, 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Id.* (quoting *Daubert*, 509 U.S. at 596).

# II. DISCUSSION

Each party has retained an expert to offer various opinions that relate to the existence of liability in this case. The Court first addresses Simon's objections to Gumwood's expert, and then Gumwood's objections to Simon's expert.

## A.     Dr. Frech

Gumwood's expert witness is Dr. H.E. Frech III. Dr. Frech holds a Ph.D. in economics and is a professor of economics. He was retained in this matter to offer opinions relating to both Simon's liability and the resulting damages. As to his liability opinions, Simon argues that he should not be permitted to offer opinions concerning the tenant negotiations and the existence of tying and coercion, and opinions that Simon has market power.

### 1.     Tenant Negotiations, Tying, and Coercion

Simon first objects to various factual opinions by Dr. Frech relating to the content and effect of Simon's negotiations with prospective tenants, including Ann Taylor, Charming Shoppes, and other retailers. In particular, Simon objects to Dr. Frech offering factual narratives about the parties' negotiations with the retailers, and opining about what Simon did and said, what its intent was, and that it coerced the retailers. For example, in his initial report, Dr. Frech engages in an extended recitation of evidence concerning Ann Taylor's negotiations with Simon and Gumwood. [Frech Report ¶¶ 141–67]. In the course of that narrative, he offers opinions such as that "Simon threatened not to renew or grant leases at important Simon properties unless the retailer agreed not to lease from Heritage Square (and sometimes to instead lease at University Park Mall)," and that "[t]hrough its tying activities, Simon coerced Ann Taylor to move away from its preferred option of locating at Heritage Square." [Frech Report ¶¶ 153, 159]. In his supplemental report, Dr. Frech further opines "that tying did occur and that it was often directed at inducing tenants to either break their relationship with Heritage Square or not to form a relationship." [Frech Supp. Report ¶ 34]. Simon objects to this testimony on a number of grounds, including that factual findings of this sort are outside of Dr. Frech's expertise, that this testimony would not be helpful to the jury, and that he relied on insufficient facts in forming his opinions.

The Court agrees this testimony would not help the jury "to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702(a), as this particular testimony merely involves making credibility judgments and resolving factual disputes, which the jury is capable of doing on its own. To be helpful to the jury, as is required under rule 702(a), an expert must actually draw on their expertise in reaching their conclusions and must testify to something more than what the jury can understand or decide for itself. *Ancho v. Pentek Corp.*, 157 F.3d 512, 519 (7th Cir. 1998). Thus, expert testimony that does little more than offer a credibility opinion is typically not admissible. *Goodwin v. MTD Prods., Inc.*, 232 F.3d 600, 609 (7th Cir. 2000) (noting that, in general, "an expert cannot testify as to credibility issues," since "credibility questions are within the province of the trier or fact"); *United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991) ("Credibility is not a proper subject for expert testimony; the jury does not need an expert to tell it whom to believe, and the expert's 'stamp of approval' on a particular witness' testimony may unduly influence the jury."). Unless the expert uses their expertise to add something to the jury's ability to understand the evidence or evaluate a witness' credibility, those matters are left to the jurors to decide for themselves. *United States v. Hall*, 93 F.3d 1337, 1343–44 (7th Cir. 1996). Likewise, an expert typically "cannot be presented to the jury solely for the purpose of constructing a factual narrative upon record evidence." *Newman ex rel. Newman v. McNeil Consumer Healthcare*, No. 10 C 1541, 2013 WL 9936293, at *6 (N.D. Ill. Mar. 29, 2013).

Here, as Dr. Frech acknowledged, and as Simon notes, the presence of tying depends primarily on what was actually communicated or conveyed between Simon and the retailers. In order to establish the coercion that is essential to a tying claim, Gumwood must show that Simon refused or threatened to refuse to give retailers leases in other properties unless the retailers also

leased at University Park or stayed out of Heritage Square. On that topic, Gumwood will offer documents and testimony that it contends show that Simon did convey such a condition to the retailers. In response, Simon will offer testimony from other witnesses denying that Simon conveyed such a condition. Thus, the jury will hear directly from the individuals who actually took part in the negotiations, will see documents related to those discussions, and can then decide which evidence is more credible. Dr. Frech's expertise as an economist offers the jury no assistance in deciding who or what to believe, so his opinions that Simon coerced the retailers, and the factual narratives accompanying those opinions, are not admissible as expert testimony.

Gumwood defends these opinions by arguing that it is common for economists to assimilate and characterize facts in writing scholarly literature, so Dr. Frech has an appropriate expertise. That argument fails to address, however, what value Dr. Frech's expertise as an economist adds to the jury's ability to understand this evidence and decide these particular questions. An economist's expertise would be valuable in deciding, for example, what effect certain facts may have on a party's ability to exercise market power. As to tying, an economist might also be asked to analyze whether or how certain facts in the record meet the applicable standard for coercion. The opinions at issue here do not offer that sort of analysis, though, and Gumwood has not shown that an economist has any relative advantage over the jury in determining what parties actually said to each other.

Dr. Frech recognized as much, too, at least in part. Before opining in his supplemental report that Simon in fact engaged in tying, Dr. Frech noted that "[t]his is primarily a factual issue, to be decided by the finder of fact, mostly based on documentary evidence and fact witnesses." [Frech Supp. Report ¶ 34]. After that disclaimer, he proceeded to state that "if it is helpful to the finder fact, it is my opinion . . . that tying did occur . . . ." [*Id.*] Likewise, when

asked at his deposition about the statement in his report that Ann Taylor preferred Heritage

Square to University Park, Dr. Frech acknowledged that "that's very . . . much a fact thing," and

he "doubt[ed] an economist would be asked something like that." [DE 194-1 p. 68].[1] Moreover,

even when Dr. Frech defended his opinions, his explanations made clear that his assessment of

the evidence on these issues was not aided by his expertise as an economist. For example, when

asked why he believed that Simon coerced Ann Taylor when even Ann Taylor's executives

denied any such coercion, Dr. Frech said that "you have to read the tenants' testimony with a

grain of salt" because they might be embarrassed to admit that they were "pushed around" by

Simon. [DE 194-1 p. 51–53]. That is hardly the product of expertise in economics.

  The parties also argue over whether Dr. Frech relied on sufficient facts in reaching his

opinion, as he conceded that he "did not spend a lot of time" reviewing the deposition of Ann

Taylor's lead negotiator, and he first offered his opinion that Ann Taylor was coerced before he

even had access to the testimony of Ann Taylor's representatives, as he believed "[t]he record

was strong enough without that." [DE 194-1 p. 48–49]. Regardless of whether that would present

an independent basis for excluding this testimony, these arguments illustrate how admitting this

type of testimony would actually distract instead of assist the jury, and would delay the trial.

Permitting Dr. Frech to offer these opinions would require a detour into exploring what

documents Dr. Frech had access to, how thoroughly he considered them, and what weight he

gave to them and why. Laboring through that process would be wasteful when the relevant

---

[1] *See also* DE 194-1 p. 10–11 ("[A]re you offering the opinion that Simon did, in fact, coerce Charming Shoppes not to open a store at Heritage Square? A. Well, I believe that's the case. I think that's more of -- much more of an issue for the finder of fact for testimony and documents. But it's clear that from -- that Simon was pressuring -- using tying pressure on Charming Shoppes and that they didn't go. Whether that's entirely causal, that's a much harder matter. It's very fact bound, and I would say I don't have an expert opinion on that.").

evidence can—and will—be presented to the jury in the first instance to decide for itself what conclusions to draw about what Simon communicated to the retailers. *See Hall*, 93 F.3d at 1343 ("If the proffered testimony duplicates the jury's knowledge, Rule 403 might counsel exclusion of the expert testimony to avoid the risk of unduly influencing the jury."); *see generally Young v. James Green Mgmt., Inc.*, 327 F.3d 616, 624 (7th Cir. 2003) (upholding the exclusion of findings by the EEOC where the plaintiffs "pointed to no evidentiary material available to the EEOC that was not otherwise available to the jury during trial"). Moreover, the jurors will not be limited to reviewing paper records and transcripts, as was Dr. Frech, as they will observe the witnesses testify live or by video deposition, making them better positioned to evaluate credibility. Thus, even if these opinions passed Rule 702's admissibility thresholds, the Court would exclude this evidence under Rule 403, as the prejudice and delay would substantially outweigh the minimal value of Dr. Frech's opinions on these purely factual matters. Accordingly, the Court grants Simon's motion in this respect.[2]

As an independent basis for excluding this testimony, Simon also argues that Dr. Frech relied on definitions of tying and coercion that are inconsistent with the law. Although these opinions are already being excluded for the reasons just explained, it is worth briefly addressing these arguments, as tying and coercion are fundamental concepts in this case. To establish that Simon's conduct was anticompetitive, Gumwood relies on a per se tying claim. That claim

---

[2] These opinions are primarily contained in paragraphs 141–67 of Dr. Frech's initial report and paragraphs 34–37 of his supplemental report. Simon's motion identified a number of additional paragraphs as being subject to this objection, but many of those paragraphs are not mentioned in its brief and are not clearly related to these arguments. Because the report itself will not be admitted into evidence, the Court need not parse the report paragraph by paragraph (neither party engages in that sort of particularized analysis, either, and even Gumwood does not argue as to whether any paragraphs are outside the scope of Simon's arguments), but the parties will be expected to conform their examinations at trial to the holdings in this order.

requires Gumwood to prove, among other elements, that Simon tied two different products (here, properties) together—that it required a retailer to lease at one property (a tied property) in order to obtain a lease at another property (a tying property) over which Simon had market power. *Reifert v. S. Cent. Wisc. MLS Corp.*, 450 F.3d 312, 317 (7th Cir. 2006). Stated differently, a party imposes a tie when it coerces or forces a purchaser to buy the tied product in order to receive the tying product. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 446 U.S. 2, 12–14 (1984).

As Gumwood notes, Dr. Frech's reports define tying as "condition[ing] the sale of one or more goods, (the 'tying' goods) on the sale of one or more other products (the 'tied' goods)," [Frech Report ¶ 138], and define "coercion" and "forcing" as "conditioning purchases in the tying market to purchasing a good in the tied market or to not purchasing a good in the tied market from a rival." [Frech Supp. Report ¶ 18]. Those definitions are generally consistent with the law. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 462 (1992) (defining a tying arrangement as "'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier'" (quoting *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5–6 (1958))). During his deposition, however, Dr. Frech defined those concepts far more broadly. For example, he testified that it would be coercive for Simon to "ask a favor" of a retailer. [DE 194-1 p. 81–82]. Further, he stated that a portfolio negotiation where nothing is final until everything is final would inherently constitute a tying arrangement. [*Id.* p. 123]. He also testified that drawing any connection at all between two markets, such as offering a discount at one mall if the retailer also leases at another mall, would constitute a coercive tying arrangement. [*Id.* p. 16–17, 19–21, 116–17].

Those statements are inconsistent with the definitions of tying and coercion in the context

of tying claims, and will not be permitted at trial. As the Court explained at summary judgment,

the existence of a tie requires more than just a package deal or a request to purchase two products

together. "[T]he essential characteristic of an invalid tying arrangement lies in the seller's

exploitation of its control over the tying product to *force* the buyer into the purchase of a tied

product . . . ." *Jefferson Parish*, 466 U.S. at 12 (emphasis added). "If instead the buyer is free to

decline the tied product or to purchase the two products separately," even if on less advantageous

terms, "then by definition there is no unlawful tying." *It's My Party, Inc. v. Live Nation, Inc.*,

811 F.3d 676, 684 (4th Cir. 2016).

Ties are most easily identified when a defendant has a general policy of refusing to sell

one product without the other. *E.g.*, *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S.

451, 463 (1992) (finding a tie when the defendant "would sell parts to third parties only if they

agreed not to buy service" from its competitors); *Jefferson Parish*, 466 U.S. at 24 (holding that a

hospital created a tie where, pursuant to a contract, it required all of its surgical patients to obtain

anesthesiological services from a particular provider). When a tie arises in the context of

individual negotiations, this element becomes more nuanced, but its content remains the same:

the seller must explicitly or implicitly *require* the buyer to purchase the tied product from it (or

refrain from purchasing the tied product from a competitor) in order to receive the tying

product.[3] "[S]trong persuasion, encouragement, or cajolery to the point of obnoxiousness" to

---

[3] *It's My Party*, 811 F.3d at 685 ("Without coercion—i.e., without requiring the customer to buy product B when buying product A—selling products A and B as a unit is simply one strategy for gaining an edge in a free marketplace."); *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1159 (9th Cir. 2003) ("A plaintiff must present evidence that the defendant went beyond persuasion and coerced or forced its customer to buy the tied product in order to obtain the tying product."); *Datagate, Inc. v. Hewlett-Packard Co.*, 60 F.3d 1421, 1426 (9th Cir. 1995); Areeda & Hovenkamp, Antitrust Law ¶ 1752b (3d ed. 2011) ("There is no tie for any antitrust purpose

induce a buyer to accept a package deal do not suffice. *Bob Maxfield, Inc. v. Am. Motors Corp.*, 637 F.2d 1033, 1037 (5th Cir. 1981); *Unijax, Inc. v. Champion Int'l, Inc.*, 683 F.2d 678, 685–86 (2d Cir. 1982) (holding that "aggressive salesmanship" is insufficient to establish a tie); *Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 723–24 (7th Cir. 1979) (finding no coercion absent a threat to terminate access to the tying product if customers failed to purchase the tied product, even where the defendant fraudulently induced purchases of the tied product). Nor does enticing a buyer to purchase the tied product, such as by offering a discount or other benefit for purchasing it with a tying product, amount to coercion on its own. *Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 272 (6th Cir. 2015).

As applied here, if strong persuasion, encouragement, aggressive salesmanship, and "cajolery to the point of obnoxiousness" do not constitute coercion, then certainly asking a tenant for a "favor" does not either. Gumwood does not acknowledge or attempt to defend Dr. Frech's statement in that regard. Likewise, as the Court noted at summary judgment, a portfolio negotiation does not constitute a tie unless a party conveys that the tied product *must* be a part of the package or they will withhold the tying product. [DE 178 p. 19 ("Gumwood must show that Simon threatened to refuse to lease other properties depending on Ann Taylor's decision on University Park and Heritage Square, not simply that the parties negotiated multiple properties together or that Ann Taylor's decision on one might have affected the terms of others.")]. Merely negotiating multiple leases together, or agreeing that nothing is final until everything is final, does not create a tie.

---

unless the defendant improperly imposes conditions that explicitly or practically require buyers to take the second product if they want the first one.").

Dr. Frech also states that coercion entails nothing more than offering a benefit in one market in exchange for action in another market. [*E.g.*, De 194-1 p. 19–21]. Gumwood defends this position, arguing that it would constitute coercion for a seller to give "a 'reward,' such as a discount or rebate on the tying product, only on the condition that the purchaser buys the tied product." [DE 201 p. 9]. However, that argument fails to distinguish coercion from competition. Areeda ¶ 1758 ("We reject the extreme views that all package discounts are ties because they tend to induce or 'coerce' package purchases . . . ."). In the context of tying, coercion means requiring or forcing the buyer of one product to purchase another product, not enticing them to do so. *Jefferson Parish*, 466 U.S. at 12; *Collins Inkjet*, 781 F.3d at 272. The seller of a tying product is entitled to compete for a buyer's business as to a tied product, and offering a benefit to buyers of the tying product does not require or force those buyers to purchase the tied product from the seller when they are still able to purchase the tied product from a competitor instead. Thus, as the Sixth Circuit recently explained in *Collins Inkjet*, "In the special case of a tie enforced solely through differential pricing, the tie is not unlawful unless the differential pricing is the economic equivalent of selling the tied product below the defendant's cost."[4] 781 F.3d at

---

[4] *See also Collins Inkjet*, 781 F.3d at 272 ("In general, the ability of the defendant to impose the threat that creates the 'forcing' depends on buyers' not being able to turn elsewhere for the tying product. . . . [I]f the defendant merely offers a discount on the tying good to buyers who also purchase the tied good, then buyers are only 'forced' to buy the tied good from the defendant if they cannot purchase the tied good elsewhere at a price low enough to offset the forgone discount for the tying product. . . . It follows that a discount on the tied product amounts to unfair competition only if the defendant is selling below cost."); *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 910 (9th Cir. 2007) (applying the same analysis to bundled discounts as exclusionary practices in monopolization and attempted monopolization claims); Areeda ¶ 1758 (noting that, in deciding whether a package discount is coercive, "we ask whether the discount has the effect of disabling a hypothetical equally efficient rival who sells only one of the two products from competing with the bundled price."); Herbert Hovenkamp, Federal Antitrust Policy: The Law of Competition and Its Practice § 10.4c p. 554 (5th ed. 2016) (stating that a package discount can be coercive "if the discount is sufficiently steep in relation to the markup on the second product" that "a rival who makes only the second product will not be able

782. However, neither Dr. Frech nor Gumwood have presented any discussion as to how any benefit or discount Simon may have offered in another market was so substantial that it would have required or forced a retailer to deal with Simon in the tied market instead of seeking comparable incentives from a competitor in that market. And without any evidence or analysis as to whether Simon's activities met this standard, this theory of tying and coercion is inapplicable to this case and cannot be raised at trial as constituting a tie.[5]

In short, under the circumstances of this case, Gumwood can only establish a tie by showing that Simon refused or threatened to refuse to lease properties in the tying markets unless the tenants also leased at University Park or stayed out of Heritage Square; or, stated another way, that Simon required the tenants to act as it wanted in University Park or Heritage Square or else lose their leases in the tying markets. Dr. Frech's statements that tying requires nothing more than asking for a favor, engaging in portfolio negotiations, or changing the costs and benefits of other leases, are not consistent with the law and may not be presented at trial.

## 2.    Market Power

Simon also moves to exclude portions of Dr. Frech's opinions relating to market power. Before addressing Dr. Frech's specific opinions on this topic and Simon's objections to them, some background is necessary on the role of market power in this case, its definition, and the manners in which it can be proven.

---

to compete effectively"); Richard A. Posner, *Vertical Restraints and Antitrust Policy*, 72 U. Chi. L. Rev. 229, 239 (2005) (noting that a loyalty rebate program could not be analyzed as a tying arrangement because no purchaser was "required" to buy one product as a condition of buying another).

[5] At summary judgment, the Court noted that coercion could be accomplished through differential pricing, but it specifically cited that as a method of coercion that is "not at issue here." [DE 178 p. 11 n.2].

### a.    Market Power in General

Market power has two distinct roles in this case. First, to prove an unlawful tying arrangement, Gumwood must prove that Simon has market power in the *tying* market or markets—any markets in which Simon refused to enter leases unless the tenants also leased at University Park or stayed out of Heritage Square. *Ill. Tool Works Inc. v. Indep. Ind., Inc.*, 547 U.S. 28, 46 (2006) ("[I]n all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product."). For example, if the jury finds that Simon refused to renew Ann Taylor's lease at Dadeland unless Ann Taylor also signed a lease at University Park, the jury would then have to find that Simon had market power in Dadeland's market in order for that tie to be unlawful. Second, as part of its monopolization and attempted monopolization claims (but not for its restraint of trade claim), Gumwood must prove that Simon has monopoly power (roughly defined as a substantial amount of market power) in the *tied* market—University Park's market—or a dangerous probability of achieving monopoly power in that market. Thus, it is essential to determine not only whether Simon has market power, but where it has that power.

Market power is typically defined as the power to profitably raise price above the competitive level. *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 109 n.38 (1984) ("Market power is the ability to raise price above those that would be charged in a competitive market."); *Jefferson Parish*, 466 U.S. at 27 n.46 ("As an economic matter, market power exists whenever prices can be raised above the levels that would be charged in a competitive market."); *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 671 (7th Cir. 1985) (defining market power as "power over price, the ability to induce buyers to pay more money by cutting back the supply of goods available for purchase" (internal citation omitted)); William M. Landes & Richard A. Posner, *Market Power in Antitrust Cases*, 94 Harv. L. Rev. 937, 937 (1981) ("The

term 'market power' refers to the ability of a firm (or a group of firms, acting jointly) to raise price above the competitive level without losing so many sales so rapidly that the price increase is unprofitable and must be rescinded."). Courts have also sometimes defined market power as "the power to control prices or exclude competition." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). The ability to exclude competition is a corollary to the ability to profitably raise prices, as "any firm that has and exercises the power to raise price above the competitive level must also be able to exclude entrants; otherwise it would not be able to maintain the higher-than-competitive price." Landes & Posner, *Market Power*, 94 Harv. L. Rev. at 977; *see E.I. du Pont de Nemours*, 351 U.S. at 392 ("It is inconceivable that price could be controlled without power over competition or vice versa.").

Broadly speaking, there are two sources of evidence of market power. The first is "direct evidence of anticompetitive effects." *Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 937 (7th Cir. 2000). That can entail showing a "reduction of output" or that the party is actually charging supra-competitive prices. *F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986). As the D.C. Circuit explained in *Microsoft*, "a firm is a monopolist if it can profitably raise prices substantially above the competitive level"; thus, "[w]here evidence indicates that a firm has in fact profitably done so, the existence of monopoly power is clear." *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001).

The second, more conventional source of evidence is a market-structure analysis, which provides circumstantial evidence of market power. *Toys "R" Us*, 221 F.3d at 937; *see Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 464 (1992) (noting that the existence of market power "ordinarily is inferred from the seller's possession of a predominant share of the market"). Under this analysis, a party defines the applicable market by determining the relevant

product market and geographic market—the parameters of a market within which a monopolist could raise prices above the competitive level without having so many customers switch to similar products or buy from sellers in other areas that the increase in price would be unprofitable—and then computes the defendant's market share within that market. A substantial market share is typically necessary but not sufficient to establish market power; if new firms could easily enter the market should the defendant begin charging supra-competitive prices, then even a one-hundred percent market share at present would not establish market power.[6] Thus, the market structure analysis generally considers the defendant's market share and the barriers to entry to evaluate whether the defendant has market power. *Microsoft*, 253 F.3d at 51 ("Under this structural approach, monopoly power may be inferred from a firm's possession of a dominant share of a relevant market that is protected by entry barriers."); *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114, 1123 (10th Cir. 2014) (similar).

### b. Dr. Frech's Market Power Opinions and Simon's Objections

Here, Dr. Frech opined that Simon has market power in the University Park market, as well as in any market used as leverage in Simon's negotiations with the retailers. Dr. Frech based these opinions on two lines of analysis. First, he conducted a traditional market-structure analysis as to University Park and three of the tying markets: Dadeland, Lenox, and Woodbury. He concluded that the relevant product market is leasable space in regional malls and lifestyle centers (or, as to Woodbury, leasable space in outlet centers). He further concluded that the geographic markets included the area within five to fifteen miles of each center (or within forty to eighty miles of Woodbury, an outlet center). He then calculated Simon's market share in those markets, which ranged from 21 to 68 percent as to Woodbury, to 54 to 84 percent as to

---

[6] Other factors could constrain a firm's ability to exercise market power, too, such as competition in a distinct but interrelated market. *E.g.*, *Kodak*, 504 U.S. at 465–66.

University Park, depending on which radius was used for the geographic markets. Finally, he considered the barriers to entry in the relevant markets, which he found to be substantial. Thus, he concluded that a firm with Simon's market share in those respective markets would possess market power in each of those four particular markets.

Second, Dr. Frech also considered direct-effects evidence, which formed the basis for his opinion that Simon had market power not only in the four markets just discussed, but also in any market that Simon used as leverage. Dr. Frech did not cite any evidence that Simon has charged supra-competitive prices in any market. However, he asserted that Simon's ability "to hinder Heritage Square's entry as a close competitor" in University Park's market shows that it was able to exclude competition. He further concluded that Simon's use of "a leveraging strategy" to achieve that result is evidence that Simon had market power in any markets used as leverage. In his supplemental report, Dr. Frech further opined that market power can be based on *ex post* opportunism in the tying markets—a threat to impose transaction costs on tenants, such as by terminating a lease, which would require the tenant to incur the cost of moving to another location. Dr. Frech also noted that some of the tying properties have been described as "dominant," "unique," or "premier."

Before turning to Simon's objections, it is important to note what Simon does not object to. First, Simon does not object to the portions of Dr. Frech's reports in which he opines that Simon has market power in the University Park market (*e.g.*, Frech Report ¶¶ 98–110). Thus, though its filings never expressly draw that distinction, Simon's motion only places Dr. Frech's conclusions as to market power in the tying markets in dispute. Second, Simon does not object to the portions of Dr. Frech's reports in which he analyzes and reaches conclusions as to the relevant product markets and geographic markets, and the existence of barriers to entry in those

markets (*e.g.*, *id.* ¶¶ 60–97 (with immaterial exceptions)). Those conclusions in turn form the basis for Dr. Frech's market-structure analysis, in which he calculates Simon's market share in the Dadeland, Lenox, and Woodbury markets and opines that the respective market shares and applicable barriers to entry give Simon market power in those markets.

Although Simon does object to the portions of Dr. Frech's reports in which he expresses his opinions that Simon has market power in the Dadeland, Lenox, and Woodbury markets, Simon's arguments are not responsive to Dr. Frech's market structure analysis. In addition, it is clear that Dr. Frech's market structure analysis provided an independent basis for his conclusion that Simon has market power in those three markets. [*E.g.*, Frech Report ¶ 60 ("In addition to the direct effects evidence described above, I have also evaluated evidence to assess Simon's potential market power using a traditional structural antitrust approach . . . . [T]his structural approach *also* shows that Simon possessed market power . . . ." (emphasis added))]. And taking his product and geographic market conclusions as given (since they were not objected to), Dr. Frech's calculation of Simon's market share in those three markets is an entirely unexceptional and unobjectionable method of inferring market power. Thus, the Court finds that Simon's motion does not justify excluding Dr. Frech's market power opinions as to Dadeland, Lenox, and Woodbury to the extent they are based on his market-structure analysis, so Simon's motion is denied in that respect.

Simon does, however, raise a number of critiques of Dr. Frech's reliance on other forms of evidence, from which he opines that Simon has market power not only in Dadeland, Lenox, and Woodbury, but also in any market that Simon used as "leverage" in its negotiations. It argues that the imposition of a tie does not itself establish that a party has market power in a tying market. It also argues that the ability to impose transaction costs in a tying market by making an

existing tenant move to another location is not evidence of market power, as every landlord, no matter how big or small, has that exact same ability to impose those exact same costs on its existing tenants. Further, it argues that the desirability of its properties is not enough to show market power, and that in any event, Dr. Frech failed to analyze Simon's centers in comparison to the competing centers in any tying market. These arguments are well-taken, and the Court agrees that Dr. Frech has not articulated a reliable basis for finding market power in any tying market based on direct-effects evidence.

First, Gumwood's reliance on direct-effects evidence fails at the outset as to any market other than University Park, Dadeland, Lenox, and Woodbury (as to which Dr. Frech conducted market structure analyses), since the Seventh Circuit has held as a matter of law that direct-effects evidence alone cannot establish market power. In *Republic Tobacco Co. v. N. Atl. Trading Co., Inc.*, 381 F.3d 717 (7th Cir. 2004), the plaintiff sought to establish market power entirely through evidence of direct anticompetitive effects. In arguing that this evidence was acceptable, the plaintiff relied heavily on the Seventh Circuit's opinion in *Toys "R" Us* and the Supreme Court's opinion in *Indiana Federation of Dentists*, each of which relied largely on direct-effects evidence in finding the existence of market power. In *Republic Tobacco*, though the Seventh Circuit interpreted those cases narrowly, and held that direct-effects evidence alone cannot establish market power:

> [N]either *Toys "R" Us* nor *Indiana Federation of Dentists* allows an antitrust plaintiff to dispense entirely with market definition. Rather, these cases stand for the proposition that if a plaintiff can show the rough contours of a relevant market, and show that the defendant commands a substantial share of the market, then direct evidence of anticompetitive effects can establish the defendant's market power— in lieu of the usual showing of a precisely defined relevant market and a monopoly market share.

*Republic Tobacco*, 381 F.3d at 737. Accordingly, because the plaintiff was unable to make a threshold showing that the defendant had a substantial market share of at least a roughly defined

18

market, the court held that the evidence of anticompetitive effects did not permit an inference of market power. *Id.*

Here, Dr. Frech purports to rely on direct-effects evidence as evidence of Simon's market power in twenty-one (or more) different tying markets. Other than Dadeland, Lenox, and Woodbury, though, he did not consider, nor has Gumwood presented evidence of, whether Simon had a substantial market share in any of those markets.[7] Thus, as a matter of law, his opinion fails to show market power in any of those other markets. Another district court in this circuit recently struck expert testimony on market power for that same reason. In *Hannah's Boutique v. Surdej*, the plaintiff's expert opined that direct evidence of the defendant's anticompetitive conduct showed that the defendant possessed market power. No. 13-cv-2564, 2015 WL 4055466 (N.D. Ill. July 2, 2015). The expert made no attempt to show that the defendant had a substantial market share in the relevant market, though. Therefore, relying on *Republic Tobacco*, the court struck the expert's testimony as legally insufficient to establish market power. *Hannah's Boutique*, 2015 WL 4055466, at *4 ("[T]he Court excludes Dr. Schafer's testimony that Peaches possessed market power because Plaintiff does not make the required initial showing that Peaches possessed a substantial share of the market."). That same analysis applies here. Accordingly, Dr. Frech may not opine that Simon has market power in any tying market outside of Dadeland, Lenox, and Woodbury.

Even if a party could rely entirely on direct-effects evidence to establish market power, though, Gumwood has not shown that Dr. Frech reliably connected the effects at issue here to the existence of market power in any tying market. As previously noted, evidence of direct anticompetitive effects typically means evidence that the party is in fact charging supra-

---

[7] Needless to say, it is too late for him to attempt to conduct that analysis now.

competitive prices in that market or, relatedly, that they have reduced output in that market, which would then allow them to profitably raise their prices. However, Dr. Frech did not analyze whether Simon has actually charged supra-competitive prices or reduced output or excluded competitors in any of the tying markets. Rather, he opined only that Simon was able to reduce output in University Park's market (the tied market) by hindering Heritage Square's ability to compete in that market. He then opines that Simon was able to create that effect by leveraging its properties in other markets, which leads to his conclusion that Simon had market power in those tying markets. However, he never articulates a reliable basis on which to conclude that the source of Simon's leverage was its market power in those markets, as opposed to some other form of leverage.

Not all leverage is market power. In fact, Dr. Frech expressly conceded as much at his deposition: "[Leverage] includes market power, but it's a little bit broader. It includes the ability to impose costs or benefits somewhere else, which is not necessarily market power." [DE 194-1 p. 282]. Dr. Frech further acknowledged that other forms of bargaining power may also affect parties' negotiations: "Bargaining power is even broader [than leverage]. But it would be included in it because you could have bargaining power based on personality and personal history and stuff like that that wouldn't necessarily be leverage from other markets." [*Id.* p. 283]. Finally, Dr. Frech explained that the very types of direct anticompetitive effects alleged here can be caused without market power in other markets: "You also can get market power by leveraging or tying in other places *where you don't actually have local market power* but you can impose transaction costs potentially making people move by not renewing, things like that." [*Id.* p. 285 (emphasis added)]. That statement directly contradicts the premise on which Dr. Frech based his

opinion that Simon has market power in the tying markets, which was that Simon's use of properties as leverage meant that it had market power in those properties' markets.

Moreover, given that Simon is only alleged to have imposed ties against a single tenant in any given tying market,[8] it is particularly important to consider whether Simon was leveraging market power in those markets, or was simply exploiting its leverage over, or the preferences of, specific tenants. As the First Circuit observed in *Grappone*, "virtually every seller of a branded product has *some* customers who especially prefer its product. But to permit that fact alone to show market power is to condemn ties that are bound to be harmless, including some that may serve some useful social purpose." 858 F.2d at 797 (noting also that market power in the context of a tying claim "means *significant* market power—more than the mere ability to raise price only slightly, or only on occasion, or only to a few of a seller's many customers"); *see also Jefferson Parish*, 466 U.S. at 26 (noting that a "preference" of certain consumers for a seller's product "is not necessarily probative of significant market power"); Areeda ¶ 1735c3 (noting that "virtually every seller has the ability to raise prices to especially loyal buyers but . . . such modest 'power' does not trigger the per se rule" against tying (citing *United States Steel Corp. v. Fortner Enters.* (*Fortner II*), 429 U.S. 610, 621 & n.14 (1977))). Here, Dr. Frech noted in his report that the retailers had about twice the level of sales in the stores that Simon used as leverage compared to stores not used as leverage. That could suggest that Simon was actually leveraging the likelihood that those retailers had a particular preference for those locations. Dr. Frech did not consider that possibility, though, and instead cited that fact as an additional source of leverage, which his report equated to market power.

---

[8] Dr. Frech identifies a number of shopping centers used as leverage against Ann Taylor, and a number used as leverage against Charming Shoppes, but there is no overlap between the two.

Dr. Frech also opined in his supplemental report that market power can be based on *ex post* opportunism in the tying markets. When Dr. Frech's reports and his deposition are read carefully, though, it is apparent that he did not actually cite *ex post* opportunism as evidence of market power *in the tying markets*. Rather, his theory appears to be that if, by whatever means, Simon is able to impair Heritage Square's ability to compete for tenants, thereby raising the barriers to entry in University Park's market, Simon is more likely to have market power *in University Park's market*.[9] In addition, in his supplemental report, Dr. Frech notes that a party's ability to cause those effects in a tied market can be "based on two different factors in the tying markets," namely, "market power in the tying markets," and "the threat to impose transactions costs on a current or prospective tenant." [Frech Supp. Report ¶ 32]. He then states that either or both of those factors could be used to weaken competition in a tied market. In other words, Dr. Frech conceded that opportunism is not the same as market power, and that either could be used to cause the alleged anticompetitive effects in the University Park market.[10] Dr. Frech calls those

_____

[9] *See also* DE 194-1 p. 282 ("[Leverage] includes . . . the ability to impose costs or benefits somewhere else, which is not necessarily market power. . . . So even if you don't have market power in the classic normal economic sense, . . . that ability to opportunistically impose costs also gives you leverage and can create market power *in the tied market*." (emphasis added)), p. 261 ("The ability to impose [transaction costs] on retailers in Miami gives you market power *in Mishawaka* or other places retailers would like to go." (emphasis added)), p. 269 ("You can always impose costs on a tenant by not renewing when they're expecting to be able to renew. Anybody can do that, and that can be a source of market power *somewhere else* . . . for anybody, in principle." (emphasis added)).

[10] Even absent a concession, the result would be the same, as the law does not equate this sort of opportunism with market power. Areeda ¶ 1735 ("[D]oes the builder [who opportunistically demands more money to perform a contract] have 'market power'? Assuredly not, even though circumstances give the builder a degree of 'leverage' over the owner and the power to extract a supracompetitive price. . . . Such supracompetitive prices are not customarily described as the kind of 'market power' addressed by antitrust law. This exploitation can exist in what is otherwise a perfectly competitive market."). And to the extent Gumwood meant to argue that *ex post* opportunism is evidence of market power in the tying markets, its argument assumes its own conclusion; Gumwood argues that opportunism is evidence of market power because "Dr. Frech

two factors "a distinction without a difference" when it comes to assessing market power in the tied market, but that is a crucial difference in the context of a per se tying claim, in which a plaintiff must prove that the defendant has market power in the tying market. *See Ill. Tool Works Inc.*, 547 U.S. at 46. Having acknowledged that the effects in question here could be caused by factors other than market power in the tying markets, Dr. Frech never explains why Simon's use of "leverage" means it has market power in any tying market, so he has not shown that he reliably applied any acceptable methodology or principles in reaching that conclusion.

The other non-structural evidence Dr. Frech cited in support of his market power opinions is insubstantial. Dr. Frech's reports note that the tying centers have been described as "dominant," "unique," or "premier," or as a "center that can be leveraged," in internal Simon documents or trade publications. He does not indicate that that is the type of evidence upon which an economist would rely to assess market power, though, nor does the law attribute significance to uniqueness alone. *Fortner II*, 429 U.S. 610, 621 (1977) ("Uniqueness confers economic power only when other competitors are in some way prevented from offering the distinctive product themselves."); *see also Will*, 776 F.2d at 672. Dr. Frech also stated that Simon had market power because retailers would have to locate in inferior malls if Simon excluded them from its properties. However, he did not actually analyze the quality of any malls, so he cannot offer a market power opinion on that basis. In addition, as Gumwood notes, Dr. Frech's explanation of that statement suggested that he was merely drawing that inference from his conclusion that Simon had market power (based on his market-share analysis), not vice versa, so this was not a basis for his opinion anyway.

---

is talking about Simon's ability to impose costs in the tying markets, which are the markets where Simon has market power." [DE 201 p. 12 (emphasis omitted)].

In sum, the Court finds that Dr. Frech has not articulated a reliable basis for his opinion that Simon has market power in the tying markets based on direct evidence of anticompetitive effects or any other non-structural evidence. Accordingly, the Court grants Simon's motion in part as to Dr. Frech's market power opinions insofar as he purports to rely on direct-effects evidence as evidence of market power in any tying market. Dr. Frech may opine that Simon has market power in the University Park market, and may opine that Simon has market power in the Dadeland, Lenox, and Woodbury markets based on his market-structure analysis. However, he may not offer any opinion that Simon has market power in any other alleged tying market.

## B.    Dr. Baye

Simon's expert witness as to liability is Dr. Michael R. Baye. Dr. Baye holds a Ph.D. in economics and is a professor of business economics and public policy. He has also previously served as the most senior economist within the Federal Trade Commission. He was retained by Simon in this matter to offer various opinions on the subject of liability. Gumwood does not challenge his qualifications, but moves to exclude two aspects of his opinions: his testimony about the economic requirements for an anticompetitive tie, and his testimony about the relevant geographic markets.

### 1.    Tying

Gumwood first objects to a line of testimony by Dr. Baye about the economic requirements for an anticompetitive tie. Specifically, Dr. Baye states that there are three necessary, though not sufficient, conditions that must be present for a tie to be anticompetitive: (1) the defendant must be a monopolist in the tying market; (2) it must commit itself to a tie; and (3)  the strategy must deter entry or induce exit of competitors in the tied market. He then proceeds to analyze whether any of those three conditions were met here, and concludes that they were not.

Gumwood objects to this testimony on the basis that it would interfere with the Court's duty to instruct the jury as to the elements of a per se tying claim and that, insofar as it is inconsistent with those elements, it would mislead the jury. The Court agrees. Simon defends this testimony by stating that it has no intention of asking Dr. Baye "to usurp the role of the Court by instructing the jury on the elements of an antitrust tying arrangement." [DE 200 p. 13]. It does not explain, though, how this testimony would not have exactly that effect. The law prescribes certain elements that may be proven to establish that a tying arrangement is unlawful under the per se tying framework, on which Gumwood relies. If a plaintiff proves those elements, then the conduct is deemed anticompetitive. For an expert to testify, then, that a tie is not anticompetitive unless, for example, the tie deters entry or induces exit of competitors in the tied market, would be misleading to the jury, as that is not part of the per se tying test. For the same reasons, that testimony would not be helpful, either, as a plaintiff need not prove that element in order to prevail under the per se tying framework.

Simon also argues that Dr. Baye's opinion is meant to respond to opinions in Dr. Frech's report about the general framework for anticompetitive tying. However, the portion of Dr. Frech's report that Simon refers to discusses more generally and briefly how tying can raise antitrust concerns, such as by using market power in one market to exclude or reduce the competitive influence of rivals in another market. Dr. Baye's opinion about the conditions that must be established for tying to actually create those anticompetitive effects thus goes beyond what is necessary or appropriate to respond to Dr. Frech. Accordingly, the Court grants the motion in this respect.

The Court notes, however, that portions of Dr. Baye's opinions on these topics overlap with the per se tying test. For example, Dr. Baye states that the first requirement for

anticompetitive tying is that the defendant must have market power in the tying markets. That is also an element of the per se tying test, so it is appropriate for Dr. Baye to offer his opinion (which he expounds on throughout his report) that Simon does not have, and would not be able to exercise, market power in any of the tying markets. Gumwood's briefs also take issue with statements Dr. Baye made during his deposition about whether particular facts would constitute a tying arrangement. Other than arguing over Dr. Baye's deposition testimony, though, Gumwood does not identify any particular opinions in Dr. Baye's report that should be excluded on this basis. Moreover, Dr. Baye's opinions relating to tying, such as whether a threat to impose a tie would have been credible, and whether the use of multi-store negotiations and the use of certain stores as leverage within those negotiations reflect the imposition of a tie, are relevant and are adequately reasoned and connected to the facts of this case. Absent any discussion as to why Gumwood's arguments would justify striking that testimony, the Court denies the motion to the extent it seeks to exclude those opinions.

In sum, Dr. Baye may not testify as to what necessary conditions Gumwood must establish in order for the tying arrangement to be considered anticompetitive. (*E.g.*, Baye Report ¶ 21). He may, however, offer opinions relating to the substance of these elements insofar as they coincide with the elements of the per se tying test.

### 2. Geographic Market

Last, Gumwood moves to exclude Dr. Baye's opinions relating to the relevant geographic markets. Dr. Baye's opinion offered a criticism of that of Dr. Frech, who opined that the relevant geographic market for a shopping center is consistent with its trade area, or the radius from which it would draw shoppers. In response, Dr. Baye opined that even though the markets for shoppers is local, the market for tenants is larger in scope and is not confined to the trade area of a particular shopping center. Specifically, he noted that the sorts of national retailers at issue here

may want to open a certain number of new stores in a year, but they are not constrained to open in any particular local market and may look across the country in deciding which markets to enter. Thus, centers in different local markets still compete with each other for tenants, which would discipline the prices that centers in those markets can charge to tenants, even if they do not directly compete for shoppers. Dr. Baye concludes on that basis that "the geographic market in which Heritage and Simon compete for tenants [is] larger and more diverse than what Dr. Frech assumes." [Baye Report ¶ 52].

In moving to exclude this opinion, Gumwood first argues that Dr. Baye did not attempt to define what the relevant geographic market is, and did not examine the boundaries of the relevant market, so he should not be allowed to testify that Dr. Frech's opinion was too narrow. That does not justify excluding this testimony, though. Gumwood bears the burden of proof, and must convince the jury to accept Dr. Frech's opinion as to the relevant geographic market. Dr. Baye's opinion identifies a factor that he believes Dr. Frech failed to properly account for, which he believes led Dr. Frech to an inaccurate conclusion. Dr. Baye's opinion is thus relevant to the jury's assessment of Dr. Frech's opinion, even if he did not undertake to determine the outer boundaries of the relevant market himself. In other words, it is perfectly appropriate for Dr. Baye to offer a criticism that Dr. Frech's analysis of the geographic market was incomplete and unreliable, without offering an affirmative opinion of his own as to the precise extent of that market.

Gumwood also argues that Dr. Baye "ignores the overwhelming evidence that markets in question are local in nature" and that his opinion is "contrary to substantial evidence." [DE 191 p. 17–18]. While Gumwood attempts to shoehorn this argument into an objection that Dr. Baye's opinion is not based on sufficient facts or data, this argument is nothing more than a

disagreement with his conclusion. Gumwood cites to Dr. Frech's opinion and to other evidence to argue that Dr. Baye is mistaken and that the relevant markets really are local. While Gumwood is free to argue to the jury that Dr. Frech's opinion is better supported and more reliable, that disagreement between experts does not render Dr. Baye's opinion inadmissible. *Schultz*, 721 F.3d at 432 (stating that, in evaluating a *Daubert* motion, a court must focus "solely on principles and methodology, not on the conclusions they generate").

In support of his opinion, Dr. Baye cited various pieces of evidence in the record, including testimony from Gumwood's own representatives that tenants "look on a national basis" and compare developments in different markets before deciding which ones to lease at. He also noted that as to one retailer in particular, Simon attempted to compete with Heritage Square by offering the retailer leases in other states. He further discussed the two-sided nature of shopping center markets, and how competition for shoppers, which is typically local, differs from competition for retailers, which can occur in a broader area. These facts adequately support Dr. Baye's opinion on this topic,[11] so Gumwood's motion is denied in this respect.

### III. CONCLUSION

Both parties' *Daubert* motions [DE 190, 192] are granted in part and denied in part as to the experts' liability opinions, as more fully explained above. Those motions remain under advisement as to the experts' damages opinions, which the Court will resolve in a separate order.

---

[11] *See also* Areeda ¶ 570b1 (noting that, while hospitals compete locally for patients, they may compete in a national market for physicians: "The market is national if hospitals engage such specialists from around the nation, if new physicians see their opportunities as national, and if even established doctors often relocate.").

SO ORDERED.

ENTERED:  October 19, 2016

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court