UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| GUMWOOD HP SHOPPING PARTNERS, L.P., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:11-CV-268 JD |
| | ) | |
| SIMON PROPERTY GROUP, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPINION AND ORDER</u>

Now before the Court are three motions related to damages in this antitrust case between plaintiff Gumwood HP Shopping Partners, L.P. and defendant Simon Property Group, Inc. Gumwood asserts claims for a restraint of trade, monopolization, and attempted monopolization arising out of competition between Gumwood's Heritage Square shopping center and Simon's University Park Mall, and this case is set for trial. The underlying facts have been set forth at length in prior orders, and the Court assumes familiarity with those orders. Each party has filed a *Daubert* motion seeking to exclude or narrow the expert damages opinions offered by the opposing party. Gumwood has also filed a motion in limine seeking a ruling that, as a matter of law, it is entitled to recover for all damages inflicted on Heritage Square, and that Simon may not argue that Gumwood's damages should be reduced because the damage to Heritage Square fell on its lender. For the following reasons, the Court grants Simon's motion to exclude the damages opinion of Gumwood's expert. The Court also grants Gumwood's motion to preclude evidence or argument that any damages to Heritage Square were sustained by the lender instead of by Gumwood. The Court denies Gumwood's motion to exclude the damages opinion of Simon's expert on the remaining grounds.

# I. STANDARD OF REVIEW

Rule 702 governs the admission of testimony by expert witnesses. Under that rule, a witness "who is qualified as an expert by knowledge, skill, experience, training, or education" may offer an opinion if the following criteria are met:

> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)    the testimony is based on sufficient facts or data;
>
> (c)    the testimony is the product of reliable principles and methods; and
>
> (d)    the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. A court has a gatekeeping role to ensure that expert testimony meets these criteria. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993); *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834–35 (7th Cir. 2015). As the Seventh Circuit has emphasized, a court does not assess "'the ultimate correctness of the expert's conclusions.'" *Textron*, 807 F.3d at 834 (quoting *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013)). Rather, a court must focus "solely on principles and methodology, not on the conclusions they generate." *Schultz*, 721 F.3d at 432 (quoting *Daubert*, 509 U.S. at 595). "So long as the principles and methodology reflect reliable scientific practice, 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Id.* (quoting *Daubert*, 509 U.S. at 596).

# II. DISCUSSION

The Court first addresses Simon's motion to strike the damages testimony of Gumwood's expert, Dr. Frech. The Court next addresses Gumwood's motion to strike the damages testimony of Simon's expert, Dr. Meyer, which also encompasses Gumwood's motions in limine.

A.     **Dr. Frech's Damages Opinions**

Gumwood asked its expert, Dr. H.E. Frech III, to "calculate damages to Heritage Square resulting from Simon's alleged anticompetitive actions, assuming liability." [Frech Report ¶ 8]. Ultimately, Dr. Frech opinioned that the damages to Heritage Square were either $13.4 million or $18.6 million as of March 2015. First, before calculating the total damages sustained by Heritage Square, Dr. Frech identified the three financial effects that could result from Simon coercing or unlawfully causing a retailer not to open at Heritage Square. First, Heritage Square would lose the revenues it would have collected from that retailer. Second, Heritage Square could lose revenues from prospective tenants who chose not to lease there because of the absence of that retailer. And third, Heritage Square could lose revenues from other tenants who did lease at Heritage Square but who paid less in rent because of the absence of the other retailers. The latter two effects encompass what Dr. Frech referred to as the "snowball effect," which is the idea that, since shopping centers depend on assembling a complementary mix of tenants, which then attract shoppers, who in turn attract tenants, and so on, the loss of one or more key tenants at a shopping center can have spillover effects and cause the center to lose revenues from other actual and prospective tenants, as well.

In order to calculate the damages in this case, Dr. Frech decided against attempting to trace each of those effects directly, and instead decided to measure them through the change in the value of Heritage Square, which would have reflected the collective effect of an injury to Heritage Square's revenues. This is known as a "before-and-after" method for calculating damages. Dr. Frech began by identifying what Heritage Square's appraisers and investors believed its value would be before the challenged conduct. He then identified Heritage Square's value as of December 2010, after the challenged conduct, to determine the total change in value of Heritage Square. Next, he estimated the extent to which the recession would have reduced

Heritage Square's value, and he subtracted that amount. At that point, what he had identified was the difference between Heritage Square's actual value and projected value that was not due to the recession. Without further explanation or analysis, though, he then asserted that that figure represented the amount of damages that Heritage Square suffered as a result of whatever anticompetitive conduct the jury may find. With interest calculated through the date of his report, Dr. Frech put that figure at $13.4 million or $18.6 million, depending on whether the appraisal or the investment amounts were used for the "before" value.

Simon argues that this analysis suffers from a number of flaws that render this opinion unreliable and unhelpful to the jury. The first problematic feature of Dr. Frech's damages model is that it is not connected to any particular underlying antitrust violation. Dr. Frech made the general assumption that "the anticompetitive conduct and effects occurred," [Frech Report ¶ 189], but did not specify what particular anticompetitive conduct and effects—which retailer or even how many retailers Simon unlawfully excluded from Heritage Square—he was attempting to trace the impact of. As the Supreme Court noted in *Comcast*, "'The first step in a damages study is the translation of the *legal theory of the harmful event* into an analysis of the economic impact *of that event*.'" *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1435 (2013) (emphasis in original). In a "before-and-after" damages model, which Dr. Frech employed, that entails comparing a plaintiff's performance before and after the unlawful conduct, and then controlling for factors other than the particular unlawful conduct in question, to isolate the effect of that unlawful conduct. *See Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 152 F.3d 588, 592 (7th Cir. 1998).[1] The problem here is somewhat different than in *Comcast*, where the

---

[1] *See also Isaksen v. Vt. Castings, Inc.*, 825 F.2d 1158, 1165 (7th Cir. 1987) (reversing an award of damages for an antitrust violation where the plaintiff measured the difference between his profits before and after the unlawful activity, because the plaintiff "made no effort to establish

expert evaluated the combined effect of four different violations but the plaintiffs could only proceed on one, leading to a mismatch between the remaining theory of liability and the damages model. Instead of evaluating too many potential violations, Dr. Frech failed to evaluate *any* particular violation, so it is difficult to find that he has reliably controlled for any other factors to isolate the effect of that particular violation, or that he has translated any particular unlawful conduct into an analysis of the economic impact of that conduct.

Gumwood attempts to defend Dr. Frech's failure to tie the damages to any particular violation by arguing that "the number of retailers that failed to go to Heritage Square due to Simon's actions is unknowable," and that Simon should be required to bear the consequences of that uncertainty.[2] This argument confuses causation of damages with the amount of damages, though. *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1161 (7th Cir. 1983) ("The courts have always distinguished between proof of *causation* of damages and proof of the *amount* of damages."). As Gumwood correctly notes, plaintiffs have a certain amount of leeway in measuring the amount of damages that flowed from a defendant's unlawful conduct. *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946) ("[E]ven where the defendant by his own wrong has prevented a more precise computation, the jury may not render a verdict based on

---

how much of the loss was due to that activity as distinct from unrelated business factors"); Philip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 392b (4th ed. 2014) ("[T]he antitrust damage calculation must isolate the effect of the antitrust violation. It should not include any other effects—good or bad—that influence the financial condition of the plaintiff.").

[2] Gumwood also argues that Dr. Frech's analysis is tied to Gumwood's theory of liability, which is that "Simon's tying caused Gumwood to lose Ann Taylor LOFT (a key tenant), which caused Gumwood to lose rental revenue from LFOT and other tenants as well as the loss of other tenants." [DE 201 p. 17]. However, Dr. Frech expressly denied that his opinion was tied to Ann Taylor or any other retailer or retailers. [Frech Dep. p. 137 ("Q. Are you making the assumption in your calculation of damages that Ann Taylor would have opened a store [at Heritage Square] in the absence of the alleged tie-in? A. No. It doesn't go that way. That's not the way that the model works.").

speculation or guesswork. But the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly."). Plaintiffs must first establish, however, that they were injured by the defendant's unlawful conduct, and their damages model must then measure the effect of that injury: "Once *causation* of damages has been established, the *amount* of damages may be determined by a just and reasonable estimate as long as the jury verdict is not the product of speculation or guess work." *Id.* (emphasis in original); *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1378 (2d Cir. 1988) ("Whatever latitude is afforded antitrust plaintiffs as to proof of damages, however, is limited by the requirement that the damages awarded must be traced to some degree to unlawful acts.").

Here, that means that Gumwood must first prove that it suffered a particular injury that was caused by Simon's unlawful conduct—that Simon's conduct towards certain retailers was unlawful and caused those retailers not to lease at Heritage Square. At that point, Gumwood may prove by just and reasonable inference what damages would have flowed to Heritage Square from that injury. Dr. Frech's opinion comes at that second step, but given that he did not identify any particular injury whose effect he was attempting to measure, Gumwood has not shown that he reliably measured the effect of such an injury.

Dr. Frech's opinion attempts to bridge the gap from that indeterminate starting point by arguing that, regardless of which or how many retailers Simon unlawfully excluded from Heritage Square, the snowball effect would account for any difference between the revenues Heritage Square would have realized from those retailers and Dr. Frech's ultimate damages figures. In defending this aspect of Dr. Frech's opinion, Gumwood points to various evidence in the record that a snowball effect can occur—that given the economics of shopping centers, the loss of one or more key retailers can have spillover effects on other actual and potential tenants

at a shopping center—and that the parties viewed some of the retailers in question as important to the success of their respective centers. The critical question to Dr. Frech's damages analysis, though, is not whether such indirect effects can or did occur, but whether Dr. Frech has offered a basis for quantifying those effects and connecting them to his damages opinion on the facts of this case. As to that question, Dr. Frech did not conduct any meaningful inquiry into what damages would have accrued to Heritage Square through the snowball effect. Nor did he offer an analysis of how the direct and indirect effects of any anticompetitive conduct would have conveniently added up to his same damages figure regardless of how many retailers Simon coerced. Rather, Dr. Frech relied on *ipse dixit* to assert that the snowball effect would have produced whatever amount of damages were necessary to reach his figures, and he made no attempt to test his hypothesis. As a result, he offered an essentially non-falsifiable opinion that the jury will be unable to tie to any particular facts in the case.

As the Supreme Court explained in *Joiner*, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). That is the case here. Dr. Frech did not conduct any analysis in an attempt to quantify the snowball effect that would have resulted from any particular finding as to liability. He merely made general reference to the snowball effect, and asserted that no matter what findings the jury makes as to Simon's liability, the snowball effect would fill in the difference such that the total damages would equal the same amount regardless of whether Simon coerced one retailer or eight retailers. He did not analyze how the snowball effect might have played out in any of those various scenarios, though, such as by examining how many additional tenants

Heritage Square might have secured or how much additional rent it could have collected from its existing tenants given any particular finding as to liability.[3] Instead, he essentially asks the jury to take his word for it that the snowball effect is however big it needs to be to result in his damages figure. That sort of analytical gap is unacceptable under *Joiner*, and cannot be excused merely because this is an antitrust case. *Isaksen*, 825 F.2d at 1165 ("*Post hoc ergo propter hoc* is not a valid methodology of damage calculation, especially when it is apparent that other causal factors are at work. . . . We do not allow antitrust plaintiffs or any other plaintiffs to obtain damage awards without proving what compensable damages were actually suffered as a result of the defendant's unlawful conduct.").

Dr. Frech also made no effort to test his hypothesis about the snowball effect or to allow the jury to evaluate whether a snowball effect sufficient to produce his damages figures actually materialized in this case. *See Daubert*, 509 U.S. at 593 (noting that factors that may bear on the reliability of an expert opinion include whether the opinion can be or has been tested, and whether it is falsifiable or refutable). At the very least, Dr. Frech could have worked backwards from his ultimate damages figures to determine how many additional retailers would have had to lease at Heritage Square and how much additional rent Heritage Square would have had to collect from its actual tenants to produce his damages figures. He could then analyze whether those outcomes could have plausibly resulted from any anticompetitive conduct by Simon, and the jury would have a frame of reference to evaluate whether the assumptions necessary to Dr. Frech's opinion actually occurred. Dr. Frech did not offer that sort of analysis, though.

---

[3] Dr. Frech also did not explain why the recession—which he concedes would have had a substantial effect on Heritage Square—would not have caused its own snowball effect.

Dr. Frech also resists any effort to tie the snowball effect or his damages figures to any facts in the case such that his assumptions could be either proven or refuted by any evidence at trial. He asserts that the damages would be the same whether Simon coerced one retailer or eight retailers, as the absence of the coerced retailers would have affected the revenues Heritage Square would have received from other actual or potential tenants. As to those indirectly affected retailers, Dr. Frech likewise asserts that the damages would still be the same regardless of whether there is evidence that any particular retailer was affected in that manner, as some other, unspecified retailers would have leased at Heritage Square in that event. Thus, Dr. Frech has attempted to offer a non-falsifiable opinion, and the jury would have to take it on faith that, whatever the facts show at trial about any retailers' decisions not to lease at Heritage Square or about the rent they would have paid, the direct and indirect effects of any anticompetitive conduct would have produced his same damages figures.

The snowball effect is not impervious to analysis or quantification, either, as Gumwood suggests, and which it attempts to use as an excuse for this lack of analysis. As Dr. Frech's report notes, the snowball effect translates to damages through two mechanisms: reduced rent from existing tenants, and lost rent from prospective tenants. As Dr. Frech's report also discusses, a major source of reduced rent from Heritage Square's existing tenants was the fact that the co-tenancy provisions in those tenants' leases were not met. That allowed those tenants to pay reduced rent based on a percentage of their sales instead of having to pay the higher base rents that would have otherwise applied. For example, Dr. Frech's report notes that, in 2009, Heritage Square's three key, national-retailer tenants collectively paid about half of the base rents in their leases (on which the appraisal based its projections) because their co-tenancy provisions were

not met.[4] [Frech Report ¶ 174, Ex. 12]. Those provisions thus had a tangible effect on Heritage Square's revenues, yet Dr. Frech did not evaluate whether any of those co-tenancy provisions would have been met but for Simon's conduct.[5]

The other component of the snowball effect is lost rent from prospective tenants who did not lease at the center due to the absence of any coerced retailers. The only analysis Dr. Frech offered on that point was in his supplemental report, where he evaluated the relation between Ann Taylor being located at a lifestyle center and the number of key national retailers that locate at a center. Specifically, he identified 159 lifestyle centers across the country, and counted how many retailers out of a list of 12 "key" retailers were located at each center. He determined that lifestyle centers that had Coldwater Creek but not Ann Taylor (as did Heritage Square) had an average of 3.89 out of the 12 key retailers, and that lifestyle centers that had both Coldwater Creek and Ann Taylor had an average of 6.77—a difference of just under three additional retailers, meaning Ann Taylor plus about two more. Dr. Frech never attempted to connect this analysis to his damages opinion, though, nor is it apparent that those numbers could support his figures. Heritage Square's net revenues from Ann Taylor over the span of its ten-year lease would have been about $1 million (at least if its co-tenancy provision had been met, though it

---

[4] Dr. Frech's damages opinion only measured the reduction in revenues from 2011 forward (specifically, the present value of those future revenues as of the date the property was transferred to the lender), so these revenues from 2009 are not part of his damages figure, [Frech Report ¶ 191], but this illustrates how the co-tenancy provisions had a significant effect on Heritage Square's revenues.

[5] Simon's expert did conduct such an analysis in calculating the damages that would have resulted from unlawful coercion of Ann Taylor, and found that Ann Taylor alone would not have made the difference as to whether any co-tenancy provisions in other leases were met. Dr. Frech's only response to that analysis was to speculate that other, additional effects might have combined to satisfy some of the co-tenancy provisions, but he never evaluated what that would have required or how that would affect his damages opinion.

was not).[6] Assuming two more retailers would have also leased at Heritage Square at comparable rates, quite a bit more would still have to have happened to reach Dr. Frech's figures of $13 million to $18 million in damages, but Dr. Frech did not offer any explanation to bridge that gap.

Even if Dr. Frech had adequately traced the harm that Simon's actions inflicted on Heritage Square, he failed to adequately consider and account for other factors that could have caused the reduction in Heritage Square's value. Measuring the harm to Heritage Square through the before-and-after method is made difficult in this case by the fact that Heritage Square was a fledgling enterprise at the time of the challenged conduct, and had no established track record against which the aftermath of the alleged violation could be compared. Dr. Frech thus relied on an appraisal that was completed prior to the challenged conduct, when Heritage Square was still under construction.[7] Under the circumstances, such an appraisal could at least in theory provide an acceptable alternative point of comparison. As Simon stresses, though, the appraisal was just a prediction, and it relied on a number of assumptions as to Heritage Square's likely future performance based on the competitive landscape that existed at the time of the appraisal. Relying on that appraisal as a starting point would have thus called for a consideration of whether those

---

[6] According to Dr. Meyer, whose calculation Dr. Frech did not dispute, Heritage Square's revenues from Ann Taylor would have been $28,739 over about the first four years of the lease, as most of the revenue from that period was offset by an initial construction allowance. Over the next six years, Ann Taylor's rent would been $139,849 per year. Adding other reimbursements for which Ann Taylor would have been responsible, the total revenues to Heritage Square would have been about $1 million. However, since the co-tenancy provision in Ann Taylor's lease could not have been met, the actual revenues would likely have been less, though it is not clear by how much.

[7] The investments upon which Dr. Frech based his alternative "before" figure were tied to the result of the appraisal, so the same concerns would apply to that approach.

assumptions held true, but Dr. Frech did not conduct such as analysis.[8] *Coleman*, 525 F.2d at 1352–53 (noting that the "[u]se of projections is entirely acceptable as long as the projections lead to a reasonable estimate of damages caused by the alleged violations," but vacating the damages award where the projections on which the experts relied failed to reflect the competitive impact of the defendant's entry into the market).

That omission is glaring, as there was at least one significant change in the competitive landscape that the appraisal did not predict: Simon built a new lifestyle center at University Park. That new construction added about one hundred twenty-five thousand square feet of vacant, leasable space that would compete directly against Heritage Square, less than a mile away. The appraisal did not account for that impending change, though. While it noted that the Marshall Field's department store at University Park was scheduled to close, the appraisal stated that "[n]o plans have been released about possible tenants for the vacant store area." [DE 194-7 p. 48]. It did not contemplate that Simon would purchase the Marshall Field's building, demolish it, and construct a new lifestyle center, as opposed to finding another department store to use Marshall Field's existing space, which would not have entailed competing against Heritage Square for tenants.

By comparison, in surveying other sources of competition, the appraisal did acknowledge a different shopping center (Toscana Park) that was under construction immediately adjacent to Heritage Square, and it indicated that this project was "of special note." [DE 194-7 p. 53]. The appraisal opined, however, that while this center would compete against Heritage Square due to its proximity, its competitive impact would be blunted because it lacked visibility from the main

---

[8] [DE 194-1 p. 216–17 ("Q. . . . [T]he appraisal report was explicitly based on certain assumptions that the appraisers were not verifying, correct? A. Correct. . . . Q. . . . Did you attempt to verify the accuracy of any of these assumptions? A. I would say no.")].

road and lacked a strong anchor tenant, meaning it was more likely to compete for local, second-tier tenants. The new lifestyle center at University Park, which the appraisal did not acknowledge, was also located near Heritage Square, but had none of those drawbacks. It had excellent visibility from the main roads, was anchored by a super-regional mall, and competed for the same high-end tenants that Heritage Square sought. That new center would have been directly relevant to the appraisal's conclusion that "the market may be undersupplied for well located, anchored, high quality retail space," [DE 194-7 p. 53], yet Dr. Frech's report did not address its impact.

Gumwood argues that Dr. Frech need not account for the increased competition from the new lifestyle center at University Park because Simon did not actually compete lawfully in attempting to lease it. That argument misses the point, though. The jury would not reach the question of damages unless it found that at least some conduct was unlawful. But in awarding damages, a plaintiff is only entitled to be put in the position it would have been in had competition been lawful, not the position it would have been in had competition been absent. *Coleman*, 525 F.2d at 1352 (holding that a damages model was invalid where it assumed a defendant's absence from the market instead of lawful competition from the defendant); *Farley Transp. Co., Inc. v. Santa Fe Trail Transp. Co.*, 786 F.2d 1342, 1351–52 (8th Cir. 1985); *see Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) (holding that damages could not be awarded where, although the plaintiff suffered a loss as a result of unlawful acquisitions, the loss "did not occur 'by reason of' that which made the acquisitions unlawful"); Areeda ¶ 657b1. It was not unlawful for Simon to construct a new lifestyle center at University Park, nor would it have been unlawful for Simon to compete vigorously against Heritage Square for retailers to lease at that new space. Thus, the "but-for world" does not assume no competition

from Simon, it assumes lawful competition from Simon in building and attempting to lease out the lifestyle center at University Park. A valid damages model must therefore account for those factors. *Marshfield Clinic*, 152 F.3d at 593 ("Statistical studies that fail to correct for salient factors, not attributable to the defendant's misconduct, that may have caused the harm of which the plaintiff is complaining do not provide a rational basis for a judgment."); *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 415–16 (7th Cir. 1992) ("The expert should have tried to separate the damages that resulted from the lawful entry of a powerful competitor . . . from the damages that resulted from particular forms of misconduct allegedly committed by that competitor . . . ."); *MCI*, 708 F.2d at 1161 ("[A]n antitrust plaintiff must prove that his damages were caused by the *unlawful* acts of the defendant."). Dr. Frech did not attempt to do so, though.

Gumwood also argues that the competitive impact of the new lifestyle center at University Park may have been lessened since its construction was a year or two behind Heritage Square's. Even if so, it strains credulity to suggest that the construction of this new center would have had no competitive impact on Heritage Square. Even if all of the same retailers would have leased at Heritage Square whether or not the lifestyle center was built at University Park, those retailers could have used (and did use) the competing centers as leverage against each other to negotiate more favorable leases. That would have still left Heritage Square worse off than it was before, even if it out-competed University Park and convinced the retailers to open at Heritage Square, so Dr. Frech could not reasonably ignore that factor entirely. *MCI*, 708 F.2d at 1162 ("When a plaintiff improperly attributed all losses to a defendant's illegal acts, despite the presence of significant other factors, the evidence does not permit a jury to make a reasonable and principled estimate of the amount of damage.").

Finally, although Simon did not raise the issue in this context, there is another critical shortcoming in Dr. Frech's analysis, in that it gives the jury no basis on which to consider or account for the effect of the statute of limitations on Gumwood's damages. As discussed at summary judgment, an antitrust claim is barred unless it is "commenced within four years after the cause of action accrued." 15 U.S.C. § 15b; *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321 (1971). Gumwood asserts a continuing violation, so a new limitations clock begins for each new and independent act that inflicts new and accumulating injury on the plaintiff. *DXS, Inc. v. Siemens Medical Systems, Inc.*, 100 F.3d 462, 467 (6th Cir. 1996); DE 178 p. 20–32. However, Gumwood can only recover damages for those new injuries that accrued within the limitations period. Any damages that resulted from acts that accrued more than four years before the suit was filed are not recoverable, even if damages continued to flow into the limitations period; in antitrust claims, new acts cannot be used to bootstrap damages that resulted from injuries prior to the limitations period. *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) ("[T]he commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period.").[9]

---

[9] *See also Zenith*, 401 U.S. at 338 ("In the context of a continuing conspiracy to violate the antitrust laws, . . . each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and . . . , *as to those damages*, the statute of limitations runs from the commission of the act." (emphasis added)); *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968) (allowing the plaintiff to bring an antitrust claim in 1955 for conduct that began in 1912, but permitting recovery of only the damages that accrued within the limitations period); *Xechem*, 372 F.3d at 902; *Stolow v. Greg Manning Auctions Inc.*, 80 F. App'x 722, 725 (2d Cir. 2003); *Smith v. eBay Corp.*, No. C 10-03825, 2012 WL 27718, at *3 n.2 (N.D. Cal. Jan. 5, 2012) (denying a motion to dismiss since the continuing violation extended into the limitations period, but noting that "[a]ny harm that accrues after the tolling of the statute of limitations periods but that is associated with an overt act that occurred prior to the limitations period is not remediable"); Areeda ¶ 320c6 ("Even in the case of the continuing conspiracy or violation, . . . plaintiffs are ordinarily limited to damages for the four years immediately preceding the filing of their lawsuit.").

As the Court discussed at summary judgment, the statute of limitations could thus pose a substantial obstacle to Gumwood's recovery, as there is no dispute that the challenged conduct began to occur, and began to affect Heritage Square, well before four years prior to the filing of this suit on June 29, 2011. For example, Ann Taylor first signed its lease at Heritage Square in June 2006, with an eye towards opening its store there that fall. It quickly asked to rescind the lease, though, which led to the negotiation of an amended lease that strengthened the co-tenancy provisions. In October 2006, Ann Taylor began construction of its store at Heritage Square, only to cease construction weeks later, at which point the space began to sit idle and the opening of the store was delayed indefinitely. Ann Taylor and Gumwood then began discussing another lease amendment in April 2007, under which Ann Taylor would resume construction and open its store. But those discussions broke down, too, and Ann Taylor neither signed the amendment nor opened its store at Heritage Square. Similarly, Dr. Frech's report acknowledges that as to J. Jill, another retailer on which Gumwood focuses, Gumwood was aware as of October 2, 2006 that "J. Jill cannot move forward in the development [Heritage Square], due to Simon relationship." [Frech Report ¶ 165].[10] Gumwood attributes all of those events to Simon's unlawful interventions.

Each of those events would have injured Heritage Square and could have affected other retailers' decisions about whether to lease at Heritage Square. Because they predated the limitations period, though, Gumwood cannot recover damages for those events, or for any portion of the snowball that may have accumulated because of the loss of those retailers during

---

[10] Gumwood also did not dispute Simon's assertion at summary judgment that Gumwood knew by March 2007 that Charming Shoppes was not going to lease at Heritage Square. [*See* DE 131 p. 6].

those periods.[11] Dr. Frech gives the jury no basis on which to evaluate the effect of the statute of limitations on his damages opinion, though. As discussed above, he did not tie his damages opinion to any particular injury. Nor did he indicate which retailers or which events would have triggered the snowball effect, or otherwise offer any basis to determine *when* the snowball would have begun accumulating. Thus, even granting Dr. Frech's opinion that the snowball effect occurred and led to his damages figure, the jury would be left entirely to speculation to determine whether any snowball effect was triggered by acts that accrued before or after the limitations period began, or to assess what portion of the snowball was attributable to acts that caused harm within the limitations period. No award of damages based on that sort of speculation could be sustained. *See MCI*, 708 F.2d at 1163 (vacating a damages award as speculative because "the jury was left with no way to adjust the amount of damages" in light of the jury's findings on liability); *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1224 (9th Cir. 1997) (similar).

For each of those reasons, the Court finds that Gumwood has failed to show that Dr. Frech's opinion is both reliable and helpful to the jury given the specific findings the jury will need to make in this case. In short, Dr. Frech's analysis is the type you might expect for a back-of-the-envelope, best-case-scenario estimate. It does not reflect the sort of rigor required to provide a fair and just determination of the damage that actually resulted from any particular antitrust violation the jury may find. Nor does it allow the jury to evaluate its applicability in

---

[11] Gumwood's pretrial filings raise the discovery rule for the first time, but it has given no indication that that rule would affect the accrual of these injuries. Gumwood was aware of each of these injuries as they occurred, and it believed Simon to be responsible, which is all the discovery rule requires. *In re Copper Antitrust Lit.*, 436 F.3d 782, 789 (7th Cir. 2006) ("[A]ccrual occurs when the plaintiff discovers that 'he has been *injured* and who *caused* the injury.'")). [*See* DE 132-64 (in an April 2007 email from a Gumwood representative, repeatedly asserting that Ann Taylor's actions were caused by Heritage Square's "resilient competitor")].

light of the facts and issues in this case. Therefore, the Court grants Simon's motion to exclude Dr. Frech's damages opinion.

The Court notes, however, that some portions of Dr. Frech's report relating to damages may still be admissible. In particular, Dr. Frech discussed the economics and externalities of shopping centers, which could assist the jury, for example, in understanding why Simon might have targeted certain key retailers if it wanted to impair Heritage Square's ability to compete. That discussion could also assist the jury in understanding how the coercion of one or more retailers could have affected the decisions of other retailers to lease at Heritage Square, which would be relevant to damages to the extent that Gumwood is able to offer evidence of the revenues Heritage Square would have realized from other tenants. For the reasons just explained, however, Dr. Frech may not offer a damages figure of his own based on those opinions.

**B.  Dr. Meyer's Damages Opinions**

Simon retained Dr. Christine S. Meyer to offer opinions relating to damages. Dr. Meyer first offered a critique of Dr. Frech's damages opinions, and she then constructed her own damages model based on the assumption that Ann Taylor would have opened a store at Heritage Square but for anticompetitive conduct by Simon. Gumwood objects to two aspects of her opinions. First, both in critiquing Dr. Frech's opinion and in offering her own damages opinion, Dr. Meyer opined that much of the damage to Heritage Square would have ultimately been sustained not by Gumwood, but by its lender, and that Gumwood's damages should only reflect the harm sustained by Gumwood itself. In objecting to these opinions, Gumwood argues that, as a matter of law, it should be entitled to recover for the entire amount of damage inflicted on Heritage Square, so Dr. Meyer should be precluded from offering opinions to the contrary.

Gumwood also filed a motion in limine[12] seeking to preclude argument that its lender sustained any of the losses, for largely the same reasons. Because the *Daubert* motion and motion in limine overlap, the Court addresses them together, and for the reasons explained below, Gumwood's motions are granted. Second, Gumwood argues that Dr. Meyer's own damages calculation is flawed because she failed to properly consider and account for the snowball effect. That argument is not well taken, so the motion is denied in that respect.

### 1. Loss to the Lender

Gumwood first moves to prevent Dr. Meyer and Simon from opining, offering evidence, or arguing that Gumwood's lender suffered any portion of the damages at issue and that Gumwood's damages should be reduced accordingly. By way of background, Gumwood was the sole owner of Heritage Square at the time of the alleged anticompetitive acts by Simon, but Heritage Square was pledged as collateral for a $33.5 million loan that Gumwood took out to finance Heritage Square's construction. The loan was non-recourse, meaning that if Gumwood defaulted on the loan, the lender's only remedy would be to foreclose on Heritage Square; if that was insufficient to satisfy the outstanding loan balance, the lender would not be able to pursue Gumwood for the shortfall. Ultimately, that possibility came to pass. By November 2010, Gumwood had defaulted on its loan, which still had an outstanding balance of over $33 million. The lender sold the note at auction for only $12.5 million, after which the purchaser of the note took ownership of Heritage Square through a deed in lieu of foreclosure in January 2011.

---

[12] Gumwood's motion in limine separately seeks to exclude the fact that Gumwood previously filed claims against Simon in state court. Simon does not oppose that motion, so it is granted. As discussed at the final pretrial conference, though, this evidence may become relevant if Gumwood opens the door, such as by accusing Simon of committing tortious interference with contract.

Because of the nonrecourse nature of the loan, Gumwood was released from its obligation to pay any of the outstanding balance on the loan at that time.

Simon argues on that basis that the brunt of any harm to Heritage Square was borne by Gumwood's lender, not Gumwood. It argues that the recession would have caused the loan to be underwater and would have caused Gumwood to default on the loan even without any anticompetitive conduct by Simon. Thus, Simon contends that Gumwood itself was not harmed by the diminution of Heritage Square's revenues after the default (or the reduction in value of Heritage Square, which reflected those lower revenues), so it should not be able to recover for those amounts. Simon presented this argument primarily through Dr. Meyer's criticism of Dr. Frech's opinion for failing to measure the damage to Gumwood itself, as opposed to the damage to Heritage Square. The same argument underlies Dr. Meyer's own damages calculation, though, so the motions are not moot. Dr. Meyer opined that the damages calculation should include any additional revenues Gumwood would have received through 2010, while it owned Heritage Square, but not any revenues thereafter, as the lender had by then taken ownership of Heritage Square, so the lender was the party that suffered the loss of those future revenues.

In response, Gumwood has filed a motion in limine and a *Daubert* motion seeking to bar any evidence or argument that Gumwood's lender suffered any of the harm or that Gumwood should not be entitled to recover for the entirety of whatever harm Simon's anticompetitive conduct inflicted on Heritage Square. In support of its motions, Gumwood focuses primarily on the collateral source rule, a common law rule under which collateral benefits conferred on a plaintiff by third parties cannot be used to reduce the damages owed to the plaintiff by a defendant. Gumwood characterizes the release of its obligation to repay the loan as a collateral benefit, and argues that the collateral source rule bars Simon from arguing that Gumwood's

damages should be reduced because it passed those losses onto its lender. Simon disagrees, arguing that the collateral source rule should not apply to antitrust claims, and that a nonrecourse loan is not a type of collateral benefit that triggers that rule anyway. In support of these arguments, the parties discuss at length various general principles touching on these topics, but neither party cites any authority that confronts the unique issues presented by these facts, whether through the collateral source rule or otherwise.

Ultimately, though the parties focus primarily on the collateral source rule, the Court believes that this issue is better evaluated under the lens of antitrust law, as a question of which party is the proper plaintiff to seek these particular damages. In particular, the Court believes that the principles of antitrust standing and the direct-purchaser rule govern whether Gumwood or its lender should be permitted to recover the damages in question for this alleged antitrust violation. First, as a matter of antitrust standing, Gumwood—the sole owner of the affected property at the time the claims accrued—is the only party that could assert an antitrust claim arising out of the alleged misconduct. Though the lender may have suffered an injury, it does not have standing to seek redress for that injury through antitrust laws. Second, as illustrated by the direct-purchaser rule, antitrust law tolerates imprecise allocation of damages between potential plaintiffs—the result of which can be to grant a windfall to some parties and deny recovery to other injured parties—where doing so promotes the vigorous enforcement of the antitrust laws. Applying those principles here, the Court concludes that antitrust law not only permits but requires any damage to Heritage Square that resulted from Simon's anticompetitive conduct to be recovered by Gumwood, not its lender.

Section 4 of the Clayton Act, under which Gumwood's claims arise, grants a private right of action to "any person who shall be injured in his business or property by reason of anything

forbidden in the antitrust laws," and allows a plaintiff to "recover threefold the damages by him sustained . . . ." 15 U.S.C. § 15(a). This provision reflects Congress' intent to "create a private enforcement mechanism that would deter violators and deprive them of the fruits of their illegal actions, and would provide ample compensation to the victims of antitrust violations." *Blue Shield of Va. v. McCready*, 457 U.S. 465, 472 (1982). Though the statutory language is broad, courts have developed a number of related doctrines that limit which parties may assert claims for which damages. *Id.* at 473. In general, these doctrines seek to place antitrust claims in the hands of "parties who can most efficiently vindicate the purposes of the antitrust laws . . . ." *Kochert v. Greater Lafayette Health Servs., Ind.*, 463 F.3d 710, 716 (7th Cir. 2006).

First, the doctrine of antitrust standing permits only certain classes of plaintiffs to sue for injuries resulting from antitrust violations. The Supreme Court has observed that an "antitrust violation may be expected to cause ripples of harm to flow through the Nation's economy . . . ." *McCready*, 457 U.S. 476–77. Nonetheless, "[i]t is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property." *Id.* at 477. Thus, "not all persons who have suffered an injury flowing from an antitrust violation have standing to sue under § 4." *Kochert*, 463 F.3d at 716; *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 598 (7th Cir. 1995) ("From the class of injured persons suffering an 'antitrust injury' only those parties who can most efficiently vindicate the purposes of the antitrust laws have antitrust standing to maintain a private action under § 4.").

In determining which parties have antitrust standing, courts look: "(1) to the physical and economic nexus between the alleged violation and the harm to the plaintiff, and (2), more particularly, to the relationship of the injury alleged with those forms of injury about which

Congress was likely to have been concerned in making defendant's conduct unlawful and in providing a private remedy under § 4." *McCready*, 457 U.S. at 478. The Supreme Court has identified a number of factors to consider in making this assessment, including:

> (1) the causal connection between the alleged anti-trust violation and the harm to the plaintiff; (2) improper motive; (3) whether the injury was of a type that Congress sought to redress with the antitrust laws; (4) the directness between the injury and the market restraint; (5) the speculative nature of the damages; (6) the risk of duplicate recoveries or complex damages apportionment.

*Kochert*, 463 F.3d at 718 (quoting *Sanner v. Bd. of Trade of City of Chicago*, 62 F.3d 918, 927 (7th Cir. 1995)) (alterations omitted); *see also Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (holding that an antitrust plaintiff must prove "antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful"). Generally speaking, this means that antitrust claims may only be brought by competitors or consumers in the affected markets who were injured by the anticompetitive conduct, or by parties who were directly injured as a means of causing the competitive harm. *McCready*, 457 U.S. at 478; *Serfecz*, 67 F.3d at 598; *Hanover 3201 Realty LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 172 (3d Cir. 2015).

A second but related doctrine that affects which parties can sue for which damages is the direct-purchaser rule, which originated in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968). In *Hanover Shoe*, the plaintiff, a shoe manufacturer, alleged that the defendant's anticompetitive practices illegally raised the plaintiff's cost to produce shoes, and the plaintiff sought damages in the amount of those increased costs. In response, the defendant argued that the plaintiff had passed those increased costs on to its customers by raising its prices, so the damages were not sustained by, and should not be recoverable by, the plaintiff. For a number of reasons, the Supreme Court barred the defendant as a matter of law from seeking to establish that the plaintiff had passed its losses onto other parties, even if the actual economic

harm actually fell on those parties. *Id.* at 494. The Court noted that tracing the increased costs through successive resales of the affected product and determining what portion of the costs were absorbed at each level and by which parties could be extremely difficult and burdensome. *Id.* It also noted that doing so would dilute the recovery of any particular plaintiff and reduce incentives to bring suit for antitrust violations. *Id.* The result would be to undermine the effectiveness of private suits as a means of enforcing antitrust laws and protecting competition. *Id.*; *see also Ill. Brick Co. v. Illinois*, 431 U.S. 720, 746 (1977) ("The combination of increasing the costs and diffusing the benefits of bringing a treble-damages action could seriously impair this important weapon of antitrust enforcement.").

In *Illinois Brick*, the Supreme Court imposed a corollary rule—that if direct purchasers can recover the full extent of damages, indirect purchasers cannot recover any damages passed on to them by the direct purchasers. 431 U.S. at 746. In doing so, the Court noted that these rules avoided the possibility of multiple recoveries from a single defendant, as only one class of plaintiffs has standing to seek those damages. *Id.* at 730–31. The Court also reiterated that these rules advanced "the legislative purpose in creating a group of 'private attorneys general' to enforce the antitrust laws under § 4," even though their result could be to deny recovery to the parties on whom the economic harm actually fell. *Id.* at 746. Moreover, the Court has resisted attempts to carve out exceptions to these rules for particular industries or in individual cases. *Id.* at 743–45; *see also Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 216 (1990) (acknowledging that the "rationales underlying *Hanover Shoe* and *Illinois Brick* will not apply with equal force in all cases," but declining to make exceptions for particular markets).

Applying these principles here, it is first apparent that only Gumwood, and not its lender, has antitrust standing to seek damages for the conduct at issue. First, Simon does not dispute that

Gumwood has antitrust standing. Gumwood was a direct competitor of Simon's in the affected market, and it alleges that Simon's conduct wrongfully excluded it from and impaired its ability to compete in that market. That sort of harm to competition is the sort of injury that the antitrust laws are meant to prevent, and as a competitor in the market who was directly affected by that injury, Gumwood has antitrust standing to seek damages for that injury. *See Serfecz*, 67 F.3d at 598 (noting that if "competing grocery stores have been precluded from the market and injured by defendants' actions, their injuries would be direct and they could maintain an antitrust action against the defendants").[13]

Gumwood's lender, however, would not have antitrust standing and could not pursue a claim for damages. It is neither a competitor nor consumer in the market for leasable retail space, as is most often required for antitrust standing. *Serfecz*, 67 F.3d at 598 (stating that antitrust standing is generally granted "only to those who, as consumers or competitors, suffer immediate injuries with respect to their business or property"). In addition, the only injury it suffered was the reduction in value of the collateral that secured its loan. That injury is purely derivative of the injury suffered by Gumwood, which owned the affected property and was a competitor in the affected market, and that injury is far removed from the type that the antitrust laws were intended to prevent. *Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n*, 830 F.2d 1374, 1378 (7th Cir. 1987) ("Merely derivative injuries sustained by employees, officers, stockholders,

_____

[13] *See also In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 158 (2d Cir. 2016) ("'Competitors and consumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury.'" (quoting *Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 10 (1st Cir. 1999))); *Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 887 (10th Cir. 1997) ("[T]wo types of parties may have standing to challenge illegal tying arrangements—the purchasers who are forced to buy the tied product to obtain the tying product . . . , and the competitor who is restrained from entering the market for the tied product . . . ."); Areeda ¶ 358a.

and creditors of an injured company do not constitute 'antitrust injury' sufficient to confer antitrust standing."); *see also Associated Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 533–34 (1983) (discussing with approval *Loeb v. Eastman Kodak Co.*, 183 F. 704, 709 (3d Cir. 1910), which held that a creditor of an injured business does not have standing to assert an antitrust claim); Areeda ¶ 353c (noting that a creditor of an affected business does not have standing because "the creditor is like the shareholder in that any injury derives from the corporation's suffering at the hands of a defendant violating the antitrust laws").

Simon argues that the lender would nonetheless have antitrust standing because its injuries were "inextricably intertwined" with Gumwood's. In support, Simon cites to the Supreme Court's decision in *McCready* and the Third Circuit's recent decision in *Hanover 3201 Realty*, but neither case supports its argument. In both of those cases, the plaintiffs were directly injured by the defendants as a means of harming competition. The injuries were also foreseeable and were necessary steps in effecting the defendants' anticompetitive ends. *McCready*, 457 U.S. at 479; *Hanover 3201 Realty*, 806 F.3d at 174. None of that is true here. Inflicting injury on Gumwood's lender was not the means by which Simon caused competitive harm in the retail real estate market, nor was it a necessary step in achieving Simon's anticompetitive ends. Simon is alleged to have caused competitive harm by depriving Heritage Square of tenants; the harm to the lender was an incidental consequence of that injury. In addition, it was pure happenstance from Simon's perspective that Heritage Square was pledged as collateral for a nonrecourse loan, which is what caused harm to be sustained by the lender. Under those circumstances, the lender's injury cannot be said to be inextricably intertwined with those of the market participants. Accordingly, Gumwood's lender would not have antitrust standing and would not be able to bring a claim for any harm to Heritage Square from Simon's conduct.

Second, the principles underlying the direct-purchaser rule require allowing Gumwood to pursue damages for the entire harm to Heritage Square, even if some or even all of that harm was passed on to other parties. As noted above, the direct-purchaser rule typically arises where a defendant unlawfully raises its customers' costs, and those customers then pass their increased costs onto their own customers. In that situation, even though the entire economic harm may not have fallen on the parties who purchased directly from the defendants, those parties are entitled to recover all of the damages that were initially inflicted on them, and the defendants are barred from showing that those parties passed the harm onto others. The situation here is somewhat different, as Gumwood's lender, not its customers, sustained some of the harm, but the principle is the same: Simon wants to argue that Gumwood's damages should be reduced because it passed its harm on to other parties. That argument raises all of the same concerns as the direct-purchaser rule, and should be barred for all of the same reasons.

Taking the most obvious objection to that result first, it is true that Gumwood could receive a windfall if, as Simon contends, Gumwood would have defaulted on its loan and lost its interest in Heritage Square even absent any antitrust violation. However, the direct-purchaser rule expressly accepts that outcome in order to ensure that the antitrust laws can be efficiently enforced. As the Seventh Circuit noted in *Motorola Mobility LLC v. AU Optronics Corp.*, 775 F.3d 816, 832 (7th Cir. 2014), the direct purchaser rule "may result in a windfall for the direct purchaser, but preserves the deterrent effect of antitrust damages liability while eliding complex issues of apportionment." The Seventh Circuit has further discussed how these principles ensure that someone is always able to seek recovery for competitive injuries:

> *Hanover Shoe, Illinois Brick,* and *McCready* make plain that the antitrust laws create a system that, to the extent possible, permits recovery in rough proportion to the actual harm a defendant's unlawful conduct causes in the market without complex damage apportionment. This scheme at times favors plaintiffs (*Hanover*

*Shoe*) and at times defendants (*Illinois Brick*), *but it never operates entirely to preclude market recovery for an injury*.

*Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 483 (7th Cir. 2002) (emphasis added).

Permitting Simon to argue that Gumwood passed the harm to Heritage Square on to other parties would have that effect of precluding market recovery for an injury, as Gumwood is the only party that has standing to assert a claim. In that event, Simon would escape responsibility almost entirely for any damage it inflicted on Heritage Square,[14] which would confer a windfall on Simon. That result would undermine the purpose of section 4 of the Clayton Act to "deter violators and deprive them of the fruits of their illegal actions." *McCready*, 457 U.S. at 472. Thus, as between granting a windfall to Simon or to Gumwood, antitrust law favors the latter.[15] *See generally UtiliCorp*, 497 U.S. at 214 ("We have maintained, throughout our cases, that our interpretation of § 4 must promote the vigorous enforcement of the antitrust laws."); *Associated General Contractors*, 459 U.S. at 544 n.51 ("[T]he feasibility and consequences of implementing particular damages theories may, in certain limited circumstances, be considered in determining who is entitled to prosecute an action brought under § 4." (quoting *McCready*, 457 U.S. at 475 n.11)); *Sports Racing Servs.*, 131 F.3d 889 (authorizing a party to assert a claim because "there is no other person who could assert a claim" for that particular antitrust injury, so holding otherwise would "immunize anticompetitive tactics or . . . eliminate a private cause of action challenging those tactics").

---

[14] Because the leases in question were back-loaded as a result of construction allowances, the vast majority of the revenues from those leases would have been realized after the lender took ownership of Heritage Square.

[15] The collateral source rule would resolve this choice the same way. *EEOC v. O'Grady*, 857 F.2d 383, 391 (7th Cir. 1988).

Permitting Gumwood to pursue damages for all of the harm inflicted on Heritage Square would also avoid complex questions of apportionment of damages and prevent double recovery, which are primary purposes of the direct-purchaser rule.[16] *UtiliCorp*, 497 U.S. at 208–13. First, if both Gumwood and its lenders were permitted to seek recovery for their respective harms, different juries could reach different findings as to how to apportion the damages. That would create the possibility that a party in Simon's shoes could be forced to pay the same damages multiple times to different parties, which the direct-purchaser rule seeks to avoid. *Id.* at 212 ("The *Illinois Brick* rule also serves to eliminate multiple recoveries."). Second, determining how to allocate the damages could itself be a complicated process and involve difficult factual determinations unrelated to the underlying violation, such as whether and when Gumwood would have defaulted on its loan but for an antitrust violation. That sort of inquiry would add an additional layer of complexity to an already complex case, which would undermine the remedial and deterrent purposes of these claims.[17]

---

[16] For similar reasons, antitrust claims can only be transferred between parties by express assignment; if transferring the affected property was itself enough to transfer the antitrust claim for harm to that property, the direct-purchaser rule would be a nullity. *Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 437–40 (3d Cir. 1993) ("[W]e see the issues of assignment and application of the direct purchaser rule as corollaries."). Here, Gumwood would have owned the entirety of any claim for damage to Heritage Square when that claim accrued, at which time it was the sole owner of Heritage Square, and it did not expressly transfer its claim when it executed the deed in lieu of foreclosure, which further indicates that Gumwood is still entitled to pursue the entire claim for damage to Heritage Square. Also, the party that purchased the note and accepted the deed in lieu of foreclosure would not have been damaged by the antitrust violation, as the price it had just paid to purchase the note from the original lender would have reflected the reduction in the future revenues.

[17] *UtiliCorp*, 497 U.S. at 208 ("The direct purchaser rule serves, in part, to eliminate the complications of apportioning overcharges between direct and indirect purchasers."); *Illinois Brick*, 431 U.S. at 737 ("Permitting the use of pass-on theories under § 4 essentially would transform treble-damages actions into massive efforts to apportion the recovery among all potential plaintiffs that could have absorbed part of the overcharge from direct purchasers to middlemen to ultimate consumers. However appealing this attempt to allocate the overcharge might seem in theory, it would add whole new dimensions of complexity to treble-damages suits

Furthermore, Gumwood is far better positioned than its lender to detect antitrust violations and bring suit for resulting damages. *UtiliCorp*, 497 U.S. at 214–16 (justifying the direct-purchaser rule in part because it places the claims in the hands of parties who have appropriate incentives and abilities to bring antitrust claims, thus promoting the "vigorous enforcement of the antitrust laws"). As a competitor in the affected market, Gumwood is well-positioned to detect anticompetitive conduct by its competitors. A lender, meanwhile, has much less ability to monitor its collateral for any anticompetitive harm. A party in Gumwood's shoes would also have incentive to bring a claim in order to ensure lawful competition in the market in which it participates, whereas a lender has no particular interest in the competitive process, but has a more limited interest in preserving the value of its collateral and its ability to collect on its loans. *See* Areeda ¶ 353c ("[A] creditor might worry that the defendant's violation hurts the debtor without rendering it insolvent. The creditor's margin of safety might thereby be reduced, but such an injury is speculative in fact and even more speculative in measurement."). Thus, allocating to Gumwood the entire claim for damages to Heritage Square would promote the most efficient enforcement of antitrust laws.

Finally, Simon argued at the final pretrial conference that the direct purchaser rule is not applicable because of an exception for pre-existing "cost-plus" contracts. *Hanover Shoe*, 392 U.S. at 494 (noting that "there might be situations—for instance, when an overcharged buyer has

---

and seriously undermine their effectiveness."); *see also* William M. Landes & Richard A. Posner, *The Economics of Passing On: A Reply to Harris and Sullivan*, 128 U. Pa. L. Rev. 1274, 1274–75 (1980). The Supreme Court has also noted that even if allocating damages may be easy in a particular case, the direct-purchaser rule should nonetheless apply for simplicity and clarity. *UtiliCorp*, 497 U.S. at 217 ("[E]ven assuming that any economic assumptions underlying the *Illinois Brick* rule might be disproved in a specific case, we think it an unwarranted and counterproductive exercise to litigate a series of exceptions."); *see also State of Ill. ex rel. Burris v. Panhandle E. Pipe Line Co.*, 935 F.2d 1469, 1477–78 (7th Cir. 1991).

a pre-existing 'cost-plus' contract, thus making it easy to prove that he has not been damaged—where the considerations requiring that the passing-on defense not be permitted in this case would not be present"). The theory behind that exception is that if a direct purchaser has a pre-existing contract in which it agrees to sell a fixed quantity of goods at a fixed markup from its costs, then any unlawful increase in those costs is guaranteed to be borne solely by the indirect purchaser, and could be recovered by that party without many of the difficulties that typically accompany claims by indirect purchasers. *UtiliCorp*, 497 U.S. at 218. Simon argues that this exception applies here because Gumwood's loan was a pre-existing contract, and that its nonrecourse nature shifted the harm to the lender.

That argument fails for multiple reasons. First, the Seventh Circuit has questioned whether this exception even exists in light of subsequent Supreme Court precedent. *Panhandle*, 935 F.2d at 1478 (noting that the Supreme Court's "interpretation of the cost-plus exception appears so narrow . . . as to preclude its application in any case"). Second, even if the exception were available, it would not apply here, as the Supreme Court has noted that the "cost-plus" exception would apply "only when . . . the direct purchaser will bear no portion of the overcharge and otherwise suffer no injury." *UtiliCorp*, 497 U.S. at 218; *see also Panhandle*, 935 F.2d at 1478. Even assuming Heritage Square would have been transferred to the lender as of January 2011, Gumwood would have still suffered any losses up to that point, so the non-recourse loan would not mean that Gumwood bore no portion of the harm or otherwise suffered no injury. *See UtiliCorp*, 497 U.S. at 210 (noting that even if an entire overcharge was eventually passed on, "difficult questions of timing" might still require apportionment of damages, which the direct-purchaser rule seeks to avoid).

In addition, the non-recourse loan did not guarantee that Heritage Square would be transferred to the lender or that the lender would assume any reduction in value of Heritage Square. It meant only that if Gumwood defaulted on its loan, the lender could look only to Heritage Square to satisfy any remaining balance. Even then, the harm to Heritage Square would only be transferred to the lender if the remaining value of Heritage Square was insufficient to cover the balance of the loan. That outcome was not a foregone conclusion at the time the loan was entered or even at the time of the alleged violations. It is also disputed whether Gumwood would have defaulted absent Simon's conduct. Thus, the nonrecourse loan would not fit the cost-plus exception to the direct-purchaser rule. *Illinois Brick*, 431 U.S. at 736 (noting that the cost-plus exception would apply only where the "effect of the overcharge is essentially determined in advance").

For those reasons, the Court finds that Gumwood is the proper party to seek damages for an injury to Heritage Square, and must be permitted to recover the entirety of those damages. Accordingly, the Court grants Gumwood's motions, and holds that Simon may not offer evidence or argue that any injury to Heritage Square was sustained by the lender instead of by Gumwood, or that Gumwood's recovery should be affected by the nonrecourse loan. In other words, the measure of damages in this case is the sum of damages sustained by Heritage Square as a result of any anticompetitive conduct.

### 2. Snowball Effect

Finally, Gumwood moves to exclude Dr. Meyer's own damages calculation on the basis that she did not adequately consider or account for the snowball effect. In calculating damages, Dr. Meyer assumed that Ann Taylor would have opened a store at Heritage Square but for anticompetitive conduct by Simon. To calculate the resulting damages, she first considered the revenues that Heritage Square would have derived directly from Ann Taylor pursuant to its lease.

She then considered any indirect effects, including whether any actual tenants would have paid more rent, and whether any potential tenants would have leased at Heritage Square if only Ann Taylor had also opened there. Many of Heritage Square's actual tenants paid reduced rent because the co-tenancy provisions in their leases had not been met, so Dr. Meyer examined each of those leases to determine whether the co-tenancy provisions would have been satisfied had Ann Taylor opening at Heritage Square. She determined that Ann Taylor alone would not have made a difference as to whether any co-tenancy provisions would have been met, so she did not attribute any damages to this potential effect.

Finally, Dr. Meyer considered whether any additional retailers would have leased at Heritage Square had Ann Taylor opened its store there. She examined the terms of various leases that were under negotiation with other retailers and reviewed other retailers' decisions as to Heritage Square. She concluded that there was insufficient evidence that any other retailer would have leased at Heritage Square had Ann Taylor opened there, so she declined to include any damages from this potential effect in her calculation, either. Thus, Dr. Meyer opined that Gumwood's damages would include only the revenues it would have received directly from its lease with Ann Taylor. She put that figure at $28,739 through the end of 2010.

Gumwood moves to exclude Dr. Meyer's opinion because she relied "on an erroneous assumption that there is no snowball effect." [DE 191 p. 13]. As Simon correctly responds, however, this is nothing more than a disagreement with her conclusion and a dispute between experts, which does not justify excluding her opinion. Dr. Meyer did not, as Gumwood argues, ignore the possibility of a snowball effect. She considered at length what effect Ann Taylor's opening at Heritage Square would have on other leases that had been signed or that were under negotiation. In particular, she considered the co-tenancy provisions of those leases to determine

whether Ann Taylor's presence would have required any prospective tenants to open at Heritage or would have triggered increased rent by any existing tenants. She also considered the course of other retailers' negotiations with Gumwood to assess whether Ann Taylor's actions would have affected their decision not to lease at Heritage Square.

Gumwood is free to present evidence to the contrary—that other tenants would have actually signed leases at Heritage Square or that existing tenants would have paid more rent had Ann Taylor opened at Heritage Square. If the jury credits that evidence, then it will discount or reject Dr. Meyer's opinion accordingly. However, the jury could also find that Dr. Meyer's analysis and underlying factual assumptions were sound—that under the particular circumstances of this case, Ann Taylor's failure to open at Heritage Square did not cause any actual tenants to pay less rent and did not cause any potential tenants not to lease at Heritage Square. This is therefore not a valid basis upon which to exclude Dr. Meyer's opinion, so Gumwood's motion is denied in this respect.[18]

### III. CONCLUSION

Simon's motion to exclude the testimony of Dr. Frech [DE 192] is GRANTED as described above. Gumwood's motions in limine [DE 217] are GRANTED. Gumwood's motion to exclude the testimony of Dr. Meyer [DE 190] is GRANTED in part and DENIED in part as described above.

---

[18] Given the Court's holding in the previous section, Simon may not present Dr. Meyer's damages calculation (which only includes damages that accumulated through 2010) as comprising the entirety of Gumwood's damages, but Dr. Meyer's opinion as to the amount of damages through 2010 is still relevant. Thus, Dr. Meyer may still opine that "the damages to Gumwood in the 2006 to 2010 period as a result of Simon's alleged tying amount to $28,739," but she may not opine that "Gumwood would [not] have avoided defaulting on the mortgage loan even if it had received additional profits in the but-for world, and, thus, there are no damages to Gumwood from 2011 onwards." [Meyer Report ¶ 146].

SO ORDERED.

ENTERED:  November 22, 2016

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court