UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| GUMWOOD HP SHOPPING PARTNERS, L.P., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 3:11-CV-268 JD |
| SIMON PROPERTY GROUP, INC., | ) ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Gumwood has filed a motion in limine seeking leave to present a new computation of damages at trial, in light of the exclusion under Rule 702 of its expert testimony on damages. Simon opposes the motion, arguing that the Federal Rules of Civil Procedure prohibit Gumwood from offering a new computation at this late stage of the case, and that the evidence does not support Gumwood's new computation. The Court addresses those arguments in turn, and for the following reasons, the Court grants Gumwood's motion in part.

**A.    Gumwood's Proposed Damages Theories**

Gumwood asserts in this case that Simon used unlawful coercion to prevent retailers from leasing at Heritage Square, Gumwood's new shopping center, and to instead cause them to lease at University Park Mall, Simon's competing center. Gumwood suggests in passing that Simon engaged in this behavior towards a number of retailers, but the focus of its case is that Simon coerced Ann Taylor. Though Ann Taylor signed a lease with Heritage Square, it never opened its store there, and eventually opened at University Park instead. Gumwood argues that because Ann Taylor Loft is such an important retailer to have in a lifestyle center, the loss of that one

tenant substantially impaired its ability to attract other retailers to Heritage Square and reduced the revenues it received from its actual tenants.

To calculate its damages, Gumwood initially relied entirely on the expert opinion of Dr. Frech. As explained in a previous order, Dr. Frech attempted to calculate damages by measuring the extent to which Simon's conduct caused a reduction in the market value of Heritage Square as of the time that Gumwood lost its ownership of the property through a deed in lieu of foreclosure. Dr. Frech noted that $38 million was invested into the project, and that an appraisal completed in 2006 projected Heritage Square's value to be $45.5 million as of October 2009. He then noted that the loan for which Heritage Square served as a security was sold in November 2010 for $12.5 million. Dr. Frech then estimated the extent to which the recession would have reduced Heritage Square's value, and attributed the remaining difference (between $12 million and $18.6 million) to whatever unlawful conduct the jury might find that Simon engaged in.

After extensive *Daubert* motions, the Court granted Simon's motion to exclude Dr. Frech's damages opinion. In response, Gumwood moved for reconsideration, and also indicated that it intended to present Dr. Frech's same damages analysis at trial, only without any expert opinion in support. The Court denied the motion for reconsideration, and also expressed skepticism about the validity of Gumwood's new proposed approach. Thus, Gumwood sought and received permission to file a motion in limine in which it would set forth the damages theories it intended to present at trial, so that the Court could rule as to whether those theories would be permitted.

Gumwood's present computation breaks its damages calculation into two periods: the periods before and after it lost its ownership of Heritage Square through the deed in lieu of foreclosure. The first period runs from July 1, 2007, just after the beginning of the four-year

limitations period prior to its filing of this suit, and extends through December 31, 2010, just prior to when Gumwood executed the deed in lieu of foreclosure. For this period, Gumwood utilized the method that Simon's expert used in her own damages model, and that Dr. Frech's report referenced but did not utilize. This approach seeks to directly trace the damages Heritage Square would have suffered through each of the three mechanisms by which Simon's conduct could have translated to losses for Heritage Square: (1) the revenues Heritage Square would have received from Ann Taylor itself, had it opened at Heritage Square; (2) the revenues Heritage Square would have received from other prospective tenants who would have leased at Heritage Square had Ann Taylor also opened there; and (3) the additional revenues Heritage Square would have received from its actual tenants, which paid reduced rent because the co-tenancy provisions in their leases were not met. For the second category, Gumwood identified ten prospective tenants who it contends would have leased at Heritage Square if Ann Taylor had opened its store there. It further argued that, even if those exact ten retailers had not leased at Heritage Square, they would have been replaced by another similar retailer. To calculate its losses from Ann Taylor and each of the prospective tenants, Gumwood used the annual rents (and contributions towards other expenses) set forth in the various leases or lease proposals, and assumed that Heritage Square would have begun receiving those amounts from each of those retailers on July 1, 2007. To calculate its losses as to the third category, Gumwood identified the entire difference between what the tenants actually paid and what they would have paid had their co-tenancy provisions been met, and attributed those amounts to damages, on the assumption that the co-tenancy provisions would have been met but for Simon's conduct. According to Gumwood's calculation, Heritage Square's losses for this period through these three categories came to

$5,669,302 (prior to accounting for the tenant allowances Heritage Square would have had to pay during this period).

Because Gumwood lost its ownership of Heritage Square in January 2011, it would not have continued receiving any rental revenues going forward, so it took a different approach to quantifying its damages from 2011 onward. For this period, Gumwood attempted to measure the extent to which Simon's conduct caused a reduction in Heritage Square's market value as of January 2011. To do so, it used the direct capitalization approach, which the appraisal and Dr. Frech's testimony referred to as a means of estimating the value of an income property with stabilized revenues. That methodology works by dividing a single year's revenues by a chosen percentage, or capitalization rate, to estimate the present value of an annual revenue stream of that amount. To apply that methodology here, Gumwood identified the revenues it would have received in 2010 through the three mechanisms just described ($1,688,175), and divided that number by the capitalization rate used in the appraisal (9.5%), to produce an estimated loss in value of $17,770,263. Gumwood proposes to present this calculation at trial through the testimony of John Phair, the CEO of Gumwood's general partner. It also wishes to note the difference between the projected value in the appraisal, and the sale value of the loan, and to indicate that its damages constitute some portion of that difference.

Finally, Gumwood notes that it would have had to incur certain costs in order to receive the revenues just described. In particular, each of the prospective tenants' leases would have included tenant allowances, which would have required Heritage Square to reimburse the tenants for a portion of their construction costs. For Ann Taylor and the ten other prospective tenants, those tenant allowances would have amounted to $2,866,052. Thus, to calculate its damages, Gumwood added the amounts from the two periods ($5,669,302 and $17,770,263), and

subtracted the tenant allowances ($2,866,052), to produce a total damages calculation of $20,573,513.

**B.      Rules 26 and 37 of the Federal Rules of Civil Procedure**

Simon argues as a threshold matter that Gumwood should be precluded from offering these alternative computations of damages because it failed to properly disclose them pursuant to Rule 26(a)(1)(A)(iii). Simon further argues that Mr. Phair's proposed testimony on the latter half of that computation—the reduction in the market value of Heritage Square as a result of Simon's allegedly unlawful conduct, as of the date Gumwood lost its ownership of the property— constitutes expert testimony, and should be excluded because Gumwood failed to disclose him as an expert as required by Rule 26(a)(2).

Rule 26(a)(1) requires parties to provide initial disclosures containing a variety of information about their claims. As relevant here, Rule 26(a)(1)(A)(iii) requires parties to provide "a computation of each category of damages claimed by the disclosing party." Fed. R. Civ. P. 26(a)(1)(A)(iii). Notably, this requires plaintiffs to identify not only the categories of damages that they seek, but also a computation of those damages. The Seventh Circuit has acknowledged that the computation "is especially necessary when plaintiff seeks complex damages such as lost profits." *Robinson v. Champaign Unit 4 Sch. Dist.*, 412 F. App'x 873, 878 (7th Cir. 2011) (citing *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 295 (2d Cir. 2006)); *see also Design Strategy*, 469 F.3d at 295 ("The need for computation and supporting documents is especially necessary in a case like this, where the damages claim is for lost profits from a project of a type with which the plaintiff had little-to-no prior experience."). Rule 26(e) also requires parties to supplement their disclosures throughout the case "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect." Fed. R. Civ. P. 26(e)(1). Thus, though parties may be unable to provide a precise computation of their damages at the outset of

discovery, when their initial disclosures are first due, they must promptly supplement their computations as they have the opportunity to develop and refine their theories through discovery. *Dynegy Marketing & Trade v. Multiut Corp.*, 648 F.3d 506, 514–15 (7th Cir. 2011) (noting that the plaintiff's general estimate of its damages might have been sufficient in its initial disclosure, but holding that exclusion of damages evidence was warranted when the party failed to supplement its explanation for that computation as the case proceeded).

Rule 26 also includes requirements for the disclosure of expert witnesses. Under Rule 26(a)(2), when an expert is not retained for the purpose of providing expert testimony, the proponent of that expert's testimony must disclose "the subject matter on which the witness is expected to present evidence" and "a summary of the facts and opinions to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C). This rule is also subject to Rule 26(e)'s supplementation requirement.

A party that fails to comply with these disclosure requirements will typically be barred from presenting the computation or expert testimony in question at trial. Rule 37(c) states that when a party fails to provide the required information or identify a witness, "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The rule also permits courts to consider whether alternative sanctions are appropriate instead of or in addition to exclusion. *Id.* "Whether a failure to comply with Rule 26(a) or (e) is substantially, justified, harmless, or warrants sanctions is left to the broad discretion of the district court." *Dynegy*, 648 F.3d at 514.

The Court first finds that Gumwood failed to comply with Rule 26(a)(1)(A)(iii)'s requirement that it disclose the computation of damages that it now wishes to pursue.

Gumwood's initial disclosures did identify the *category* of damages it sought—"the loss in value of Heritage Square and the loss in rents that it would have otherwise received absent Simon's misconduct"—but it did not provide the *computation* of those damages on which it now relies.[1] The first time it disclosed that computation was in its present motion in limine, filed over 18 months after the close of discovery. In attempting to defend this late disclosure, Gumwood notes that a supplement to an initial disclosure is considered timely "if it is made within a reasonable time after the new information is discovered." [DE 319 p. 4 (citing *Bancor LLC v. Jupiter Aluminum Corp.*, 767 F. Supp. 2d 959, 969 (N.D. Ill. 2011)]. However, its present computation does not rely on any "new information"—all of the information pertinent to the computation has been available to it for years. The new information Gumwood is referring to is apparently the exclusion of Dr. Frech's damages opinion.[2] However, the present computation does not depend in any way on that new development. Gumwood could have disclosed this same computation long ago; it chose not to, and instead chose to rely on Dr. Frech's opinion, but that does not make its present disclosure timely. Gumwood also argues that it "provided its alternative calculations to Simon immediately upon their completion." *Id.* That is no defense, though, as this computation could have been completed years ago. Thus, Gumwood's disclosure of this computation at such a late stage in this case violated Rule 26(a)(1)(A)(iii).

---

[1] The computation in Gumwood's initial disclosure estimated its damages as the difference between the appraised value of Heritage Square and its sale value. That may have been acceptable for such an early stage in the case, but is wholly inadequate at this stage, and that computation did not suffice to put Simon on notice of Gumwood's present computation. *Dynegy*, 648 F.3d at 514–15. Gumwood's later disclosure of Dr. Frech's report sufficed to disclose the computation set forth in his report, but again, that computation does not encompass the computation on which Gumwood now relies. Gumwood does not argue otherwise, but argues only that its later disclosure of its present computation constituted a timely supplement.

[2] Even then, this computation was first disclosed nearly four months after Dr. Frech's opinion was excluded. Given the age of the case and the then-impending trial date, it is difficult to characterize that delay as reasonable.

In addition, as to the damages Gumwood seeks for the change in value of Heritage Square (representing damages from 2011 onward), Gumwood not only violated Rule 26(a)(1)(A)(iii) by failing to disclose this computation, it also violated Rule 26(a)(2) by failing to disclose Mr. Phair—on whose opinion this aspect of the computation relies—as an expert witness. There is no dispute that Gumwood did not disclose Mr. Phair as an expert, so the only question is whether he qualifies as an expert witness or can instead offer this testimony as a lay witness.[3] The first clue in that regard is that the subject of his testimony is exactly the same as the subject on which Dr. Frech was retained to offer his expert opinion: the reduction in market value of Heritage Square as a result of unlawful conduct by Simon, as of the time Gumwood lost its ownership of the property. That is a complex question, requiring Mr. Phair to select and then implement an appropriate methodology in order to track the effects of a specific event and compare them to what would have occurred in a hypothetical world absent that event.

In arguing to the contrary, Gumwood attempts to invoke the proposition that an owner or officer of a business is generally permitted to "'testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert.'" *Indianapolis Airport Auth. v. Travelers Prop. Cas. Co. of Am.*, 849 F.3d 355, 372 (7th Cir. 2017) (quoting Fed. R. Evid. 701 advisory committee's note to 2000 amendments). The Court is unpersuaded that Mr. Phair's proposed testimony fits that framework, though. He is not

---

[3] Ultimately, this evidence would be excluded regardless of whether it qualifies as lay or expert testimony—in either event, Gumwood still violated Rule 26(a)(1)(A)(iii) by failing to disclose this computation. As this is a new opinion offered for the first time at this late stage of the case, and would clearly require follow-up discovery by Simon, followed by supplemental reports by its expert, perhaps followed by additional motion practice, and so on, this violation is neither justified nor harmless. Given those findings, and because Gumwood still has the ability to pursue other categories of damages, the exclusion of this opinion and the computation of damages it would support are necessary.

merely testifying as to the value of Heritage Square at a given time or to its projected profits; he is attempting to measure the extent to which Simon's conduct would have caused a reduction in the market value of Heritage Square. Gumwood does not suggest that Mr. Phair performed such an analysis in the course of his role as an owner of Heritage Square or that he gained personal knowledge of each of the factors required to perform this damages analysis in that role.

Notably, in defending Mr. Phair's use of the direct capitalization approach as the appropriate methodology, Gumwood does not argue that Mr. Phair chose that methodology based on his personal experience, as he would have to for this to constitute a lay opinion. Instead, it argues that other evidence—testimony by Dr. Frech and the appraiser[4]—will establish that this methodology is valid and appropriate. That argument only confirms that Mr. Phair is not offering this testimony based on his own lay knowledge, but is offering an expert opinion: As shown by the cases Gumwood relies on, lay witnesses may not offer opinions based on hypotheticals or assumptions to be established through other witnesses, but can only testify based on their own

---

[4] Gumwood's reliance on the appraisal to justify Mr. Phair's methodology is also notable in that the appraisal states that the direct capitalization method—which estimates the present value of a stream of future revenues by dividing a single years' revenues by a chosen percentage, or capitalization rate—"is particularly applicable to properties with stabilized income streams." [DE 194-7 p. 120, 170]. The appraisal further notes that this method "reflects the value of the subject based on the projected net operating income estimate in place at the time of stabilization but does not directly take into account lease expirations and other variations in the income stream that are typical of a leased property." [DE 194-7 p. 172]. Thus, Gumwood's use of this methodology assumes that, in every single year, projected indefinitely into the future, Heritage Square would lose the same amount of income as a result of Simon's conduct that it lost in 2010. In other words, it assumes that Heritage Square would perpetually receive the revenues from the eleven prospective tenants, even though the leases in question were mostly 10-year leases; that no other retailers would ever replace those eleven prospective tenants (that Heritage Square would never mitigate any of its damages), meaning that those tenants' 40,000 square feet would forever lay vacant; and that Heritage Square would never meet the co-tenancy provisions in its actual tenants' leases, even though, again, those leases had finite terms. Gumwood has not offered any basis for those assumptions. Even if the appraisal considers the direct capitalization approach a valid methodology for estimating the value of certain types of properties, that says little about whether it is a valid methodology for measuring damages in this case.

personal knowledge and observations. *Cunningham v. Masterwear Corp.*, 569 F.3d 673, 676 (7th Cir. 2009) (holding that a property owner can testify about the value of his property "either as a matter within his personal knowledge" or, "if he is an expert on property values, as an expert witness," but that he cannot "merely repeat another person's valuation"); *Teen-Ed, Inc. v. Kimball Int'l, Inc.*, 620 F.2d 399, 404 (3d Cir. 1980) (holding that a property owner testifying as a lay witness is "more restricted than if he were proffering opinion evidence as an expert," as only "a qualified expert may answer hypothetical questions"). Thus, the Court finds that Gumwood violated Rule 26(a)(2)(C) by failing to disclose Mr. Phair as an expert witness.

The Court must therefore determine the appropriate remedy for Gumwood's failure to comply with these provisions. The Seventh Circuit has held that "the sanction of exclusion is automatic and mandatory unless the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless." *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003). The Seventh Circuit has identified a number of factors to guide courts' analysis, including: (1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date. *Id.*

The Court does not find that these violations were justified, as it is readily apparent that Gumwood made a strategic decision to rely solely on Dr. Frech's opinion, to the exclusion of any alternative computations of damages. Gumwood has known (or should have known) from the outset that Simon would contest the validity of Dr. Frech's damages opinion. In addition, Simon's expert submitted a report setting forth her own damages calculation, using the same methodology on which Gumwood now relies as to the period through 2010. Gumwood did not offer its own computation using that methodology at the time, nor did it offer any alternative or

fallback computations. In fact, Dr. Frech's opinion did not even attempt to incorporate damages for the period through 2010, yet Gumwood did not offer any other computation for that period, further showing that Gumwood made a deliberate choice to rely solely on Dr. Frech's opinion and to forego any alternative or additional computations. That may have been a reasonable choice as a strategic matter, *see Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 152 F.3d 588, 595 (7th Cir. 1998), but it does not justify Gumwood's late disclosures now that its risk did not pan out. *See Weisgram v. Marley Co.*, 528 U.S. 440, 455–56 (2000) ("Since *Daubert*, . . . parties relying on expert evidence have had notice of the exacting standards of reliability such evidence must meet. It is implausible to suggest . . . that parties will initially present less than their best expert evidence in the expectation of a second chance should their first try fail. . . . In this case, for example, although [the plaintiff] was on notice every step of the way that [the defendant] was challenging his experts, he made no attempt to add or substitute other evidence.").

The question is thus whether the violation was harmless. The Court addresses that question separately as to the rent-based damages prior to Gumwood's loss of the property, and as to the reduction in the market value of Heritage Square as of the date Gumwood lost the property, as the result is different for those separate periods. Beginning with the loss of rental revenues prior to Gumwood's loss of the property, the Court does find that Gumwood's violation was sufficiently harmless to permit it to pursue that theory at trial. As to these damages, Gumwood seeks to recover (1) the income it would have received from Ann Taylor absent Simon's interventions; (2) the income it would have received from ten other prospective tenants that it contends would have leased at Heritage Square if Ann Taylor had opened there; and (3) the additional income it would have received from its existing tenants that paid reduced rent

because the co-tenancy provisions in their leases were not met. Though Dr. Frech attempted to calculate these damages collectively and indirectly, through the change in value of Heritage Square, he identified those three categories as the mechanisms by which Heritage Square would have been damaged. And though Dr. Frech did not tie his opinion to reduced rents from any particular retailers, Simon always had an incentive to investigate and determine whether any retailers would have leased at or paid additional rent to Heritage Square but for Ann Taylor's absence. As Simon's expert discussed at length in her report,[5] a lack of evidence that these effects actually materialized at Heritage Square would have undermined Dr. Frech's theory that a "snowball effect" actually occurred and inflicted such profound damage.

It is clear that Simon did in fact investigate whether those effects materialized, meaning that it is already positioned to respond to the arguments Gumwood intends to offer in support of this aspect of its computation. As just noted, part of Simon's response to Dr. Frech's opinion was to contend that the "snowball effect" did not actually materialize—that no other prospective tenants failed to lease at Heritage Square due to Ann Taylor's absence, and that no actual tenants paid less rent to Heritage Square due to Ann Taylor's absence—so it has already marshalled the evidence it needs to respond to Gumwood's present theory, even though that theory now

---

[5] "[A]lthough there potentially could be retailers that would have chosen to open stores at Heritage Square if Ann Taylor LOFT had opened in the but-for world, such an effect is only a theoretical possibility. Dr. Frech refers to this effect as a snowball effect and claims that the loss of other tenants as a result of the loss of key retailers is a financial harm to Heritage Square. However, whether such a so-called snowball effect indeed exists in the case of Heritage Square requires analysis; presumption and allegation are insufficient to establish the effect in this case." [Meyer Report ¶ 119]. "It is important to note that these three mechanisms *could potentially* increase Gumwood's profits. Without documentary or empirical evidence, one cannot assume that the opening of a tenant in dispute would in fact increase Gumwood's profits through any or all of the mechanisms. It is therefore necessary to examine and analyze each mechanism separately and, if appropriate, determine the magnitude of each component of Gumwood's incremental profits." *Id.* ¶ 114.

attempts to trace those effects directly. Simon has also been on notice of the evidence Gumwood intends to present, as Gumwood relies for this theory entirely on exhibits it has already designated as trial exhibits and lay testimony by witnesses already on its witness list. In addition, as discussed at more length below, Simon's response brief includes a thorough criticism of Gumwood's arguments about the amount of revenues it would have received during this period, which further shows its ability to respond to this evidence.

Most notably, Simon's own expert already prepared her own damages model in which she computed damages by this same methodology, tracking potential damages through each of those three mechanisms. Thus, Simon already has an expert witness who can respond to Gumwood's present computation. As to the reduced rents from existing tenants, Dr. Meyer analyzed the co-tenancy provisions in each of the tenants' leases, and she determined why each of those provisions were not met and what else would have to have occurred to meet them. Dr. Meyer also considered at length whether any other retailers would have leased at Heritage Square had Ann Taylor opened there. Her report contains an extensive discussion of the evidence as to whether certain retailers would have leased at Heritage Square but for Simon's alleged conduct. [DE 153-3 ¶¶ 75–111]. That discussion specifically addresses five of the ten retailers on which Gumwood's current damages calculation is based,[6] and also includes a more general discussion about Heritage Square's desirability to different kinds of retailers and the number of retailers Heritage Square could have been expected to attract. Dr. Meyer also evaluated the co-

---

[6] Dr. Meyer expressly stated that she would be capable of updating her computation to address any other retailers: "The methodology I describe in this report is capable of being applied to any but-for world scenario. If the finder of fact determines that a different set of retailers would have opened stores at Heritage Square but for Simon's alleged tying, I could apply the same methodology described here and calculate damages accordingly." [Meyer Report ¶ 74]. If she wishes to update her report to address any of the other retailers included in Gumwood's present computation, she may do so, so long as she does so promptly.

tenancy provisions in a number of the prospective tenants' proposed leases, and concluded that Ann Taylor alone would not have made a difference as to whether those provisions were met, which she cited as further evidence that these prospective tenants would not have leased at Heritage Square regardless of any unlawful conduct by Simon. These materials show that Simon is already capable of meaningfully responding to this aspect of Gumwood's damages computation, notwithstanding Gumwood's untimely disclosure. The Court therefore finds that Gumwood's failure to disclose this aspect of its damages calculation—the loss of revenues it would have received from actual and prospective tenants through 2010—is sufficiently harmless to allow it to pursue this theory at trial.

The same is not true of the remaining aspect of Gumwood's damages computation—the change in the market value of Heritage Square as of January 2011, when Gumwood lost its ownership of the property. In support of this aspect of its computation, Gumwood intends to offer the testimony of Mr. Phair, in which he proposes to estimate the change in the market value of Heritage Square through the direct capitalization approach, based on the revenues Gumwood contends it lost in 2010 as a result of Simon's conduct. Unlike the preceding period, Gumwood's computation for this period is brand new, and was neither expressly nor implicitly raised as a measure of damages by any of Gumwood's previous theories.[7] Thus, permitting Gumwood to present this new theory at trial—particularly in support of a claim for nearly $18 million in damages, prior to trebling—would be extremely prejudicial. For Simon to be able to adequately respond to this theory, it would at the very least need to depose Mr. Phair again, even though Mr.

_____

[7] Gumwood notes that the appraisal considered the direct capitalization approach in part in reaching its valuation, but it did so in the context of estimating the value of Heritage Square, not trying to track the impact of a specific event on that value. Gumwood never previously suggested that it would attempt to measure damages in that manner.

14

Phair already testified in a deposition that he had no information on Gumwood's damages calculation beyond that set forth in the initial disclosures. Before doing that, Simon would likely need to consult with its own expert in order to be prepared to adequately probe the basis for Mr. Phair's opinion. Simon would then need its expert to prepare her own report responding to Mr. Phair's opinion. This process would likely have to be followed by additional motion practice as to the admissibility of this testimony, all of which would entail further delay and consume more of the parties' and the Court's resources.

Gumwood argues that this prejudice has been mitigated because its present motion has already required the trial date to be vacated. However, the lack of a current trial date does not equal a lack of prejudice—a trial date would *never* be set if the parties were allowed to continuously adopt new theories in response to each of the Court's pretrial rulings. And as just noted, conducting the additional proceedings that would be required to permit this new theory would be costly and burdensome to both the parties and the Court, even aside from the delay. Those burdens need not be tolerated at this stage of the case, as Gumwood had ample opportunity during the discovery period to develop its damages theories as it saw fit. During that time, Gumwood chose to focus solely on Dr. Frech's opinion as a means of proving its damages; that its choice did not work out as it hoped does not justify further delaying this case and imposing additional costs.

Gumwood also argues that excluding this aspect of its damages computation would undermine the enforcement of antitrust law, citing *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 300 (3d Cir. 2012). But it was Gumwood that made the choice to rely solely on Dr. Frech's opinion, aware of the possibility that his opinion could be excluded. Gumwood is thus not well-positioned to argue that it should be excused from the consequences because its own strategic

choices have undermined the enforcement of antitrust law. In any event, the Court believes that permitting Gumwood to seek the rent-based damages described above appropriately balances the interests of enforcing the antitrust laws and permitting Gumwood to seek some recovery, against the prejudice to Simon and the need to bring this case to a prompt and efficient resolution, which serves the parties, the public interest, and the courts.

Finally, Gumwood also seeks to support its change-in-value theory by presenting Heritage Square's projected value in the appraisal ($45.5 million), and its sale value in January 2011 ($12 million), and arguing that its damages constitute some portion of the difference. However, that theory is grossly deficient. Presenting those two data points and suggesting that the damages are somewhere in the middle would be asking the jury to engage in pure speculation. That is unacceptable, even in an antitrust case. *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946) ("[E]ven where the defendant by his own wrong has prevented a more precise computation, the jury may not render a verdict based on speculation or guesswork. But the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly.").

Therefore, the Court will not permit Gumwood to pursue its proposed computations for the change in value of Heritage Square as of January 2011. For the same reasons, the Court will not entertain any new damages computations going forward. This case is already over six years old; Gumwood had a chance to develop its damages theories during discovery; and it has now presented alternative theories following the exclusion of Dr. Frech's opinion. Though the Court has excluded those theories in part, the time has come to move forward with the case based on what has already been presented.

16

**C.       Whether There Is an Evidentiary Basis to Support the Remaining Damages Theory**

As to the remaining aspect of Gumwood's damages computation, the Court must consider Simon's argument that this computation is unsupported by the evidence and does not provide the jury with a reasonable basis on which it could calculate damages. Simon argues that there is insufficient evidence that any particular prospective tenant would have actually leased at Heritage Square if only Ann Taylor had also opened there within the limitations period; that Gumwood has failed to offer a reasonable basis to quantify the proceeds it would have received from any prospective tenants; and that the evidence is insufficient to show that Gumwood would have received any additional revenues from its actual tenants. A jury could find these arguments to be persuasive, and could accordingly reduce the amount of damages or decline to award damages. However, the Court finds that there is evidence from which a jury could find that Gumwood lost revenues from its actual and prospective tenants, and could award damages accordingly. Thus, the Court rejects Simon's suggestion that it should be permitted to move for summary judgment on the basis that there is no evidence of damages. As to whether the evidence will support the full amount of damages outlined on Gumwood's motion, the Court believes that that is best left to be explored through the evidence at trial, subject to the explanations below.

First, Gumwood seeks as damages the reduced revenues that it received from five of its actual tenants. Those tenants paid reduced rent because the co-tenancy provisions in their leases were not met, which allowed them to pay rent based on a percentage of their sales instead of the annual rents set forth in the leases. As Simon notes, for Gumwood to include these amounts among its damages, it would have to show that the co-tenancy provisions would have been met but for Simon's unlawful conduct. However, the co-tenancy provisions each contained multiple requirements, and Ann Taylor alone would not have made the difference as to whether the provisions were met as a whole. Thus, Gumwood would have to show that the remaining

17

requirements would have been met had Ann Taylor opened at Heritage Square—an issue to which Gumwood's brief devotes little attention.

However, the Court does believe that a jury could find that at least some of the co-tenancy provisions would have been met at some point during this period. For example, according to the report from Simon's expert, the co-tenancy provision in Eddie Bauer's lease would have been met if Heritage Square reached 70% occupancy by square foot. [Meyer Report ¶¶ 124–140]. By the end of 2010, Heritage Square would have been within 2,000 square feet of that target with the addition of Ann Taylor. [Meyer Report, Ex. 10B]. Thus, the co-tenancy provision may have been met if Ann Taylor's opening at Heritage Square had caused even one more prospective tenant to lease there, which is a plausible outcome. In addition, Coldwater Creek's co-tenancy provision would have been met if Heritage Square had been built up to 204,000 square feet, as originally planned, instead of only 179,000 square feet. [Meyer Report ¶ 128]. Gumwood has indicated that it expects to offer testimony from its management that it would have completed that construction had Ann Taylor opened its store at Heritage Square. That testimony would offer an evidentiary basis from which the jury could find that this co-tenancy provision would have been met, too. Moreover, because Gumwood identifies the lost revenues from each tenant by year, (Ex. 987), the jury will be able to calculate damages in light of whatever findings it may make as to whether and when these co-tenancy provisions would have been met.

Gumwood also seeks the revenues it contends it would have received from Ann Taylor and ten other prospective tenants that it contends would have opened at Heritage Square but for unlawful conduct by Simon. In response, Simon first argues that there is no evidence that Ann Taylor's actions within the limitations period actually affected any other retailer. True, there is

little direct evidence that any other particular retailer would have leased at Heritage Square if only Ann Taylor had opened a store there within the limitations period—for example, no retailer will testify that if Ann Taylor had opened at Heritage Square within the limitations period, they would have too. There is also evidence that some of the prospective tenants at issue had decided prior to the limitations period that they would not lease at Heritage Square, in which case any resulting losses would not be recoverable as damages. A representative from Charming Shoppes, for one, testified that the retailer preferred University Park's outdoor addition to Heritage Square, and that it had decided prior to the limitations period to locate at University Park. However, there is enough circumstantial evidence of the importance of Ann Taylor to the success of a lifestyle center, and evidence of other retailers' interest in having Ann Taylor as a co-tenant, that a jury could find that Ann Taylor's presence at Heritage Square would have led one or more other retailers to lease there too. That could be one or more of the retailers Gumwood identifies, or perhaps another retailer of which they are representative. That is a question that will need to be explored through the evidence at trial. But the Court does believe, based on the submissions before it at this stage, that a reasonable jury could find that one or more additional retailers would have leased at Heritage Square had Ann Taylor opened there in the pertinent period.

Simon also objects that Gumwood's damages theory assumes that Heritage Square would have begun receiving revenue from each of Ann Taylor and ten other prospective tenants within two days of the beginning of the limitations period—an assumption that Simon views as far-fetched. That is not grounds for excluding this computation, though. Since Gumwood seeks to calculate its revenues based on the annual rents (and contributions towards other expenses) set forth in the leases, the jury can calculate damages based on whatever period it finds the prospective tenants would have leased at Heritage Square. For the same reason, Gumwood's

argument that Ann Taylor would have terminated its lease after 18 months, which is a possibility but not a certainty, is not a basis for excluding this evidence, as the jury could award damages for whatever period Ann Taylor would have paid rent (and for whatever other effects Ann Taylor's presence during that time would have had at Heritage Square).

Simon also argues that, since the annual rents set forth in the leases were often subject to co-tenancy provisions, Gumwood would have to show that those provisions would have been met if it wishes to seek those amounts as the measure of its damages. Unfortunately, Gumwood's present motion does not even address that topic. However, Gumwood may be able to make that showing as to at least some of the prospective tenants. For example, as with the co-tenancy provisions discussed above, some of these provisions were determined by the occupancy rate, which Gumwood could argue would have been met if Ann Taylor's opening had caused enough additional tenants to lease at Heritage Square.

Notably, however, Gumwood has yet to offer any colorable explanation for how Ann Taylor's co-tenancy provision would have been met. As discussed in previous orders, one of the required co-tenants in Ann Taylor's lease was a new concept store in testing by Brooks Brothers, known as "346." In December 2006, over six months prior to the limitations period, Brooks Brothers notified Gumwood that it was cancelling the entire line of 346 stores, and would thus not be opening at Heritage Square.[8] Therefore, Heritage Square would have never been able to satisfy Ann Taylor's co-tenancy provision. Since Heritage Square would thus have not received

---

[8] Gumwood's reply brief suggests that Brooks Brothers might have cancelled the entire line of 346 stores as a pretext to be able to cancel its lease at Heritage Square, but none of the evidence it cites comes close to supporting that proposition. In addition, the question here is less why Brooks Brothers cancelled its lease in 2006, but whether, had Ann Taylor opened at Heritage Square within the limitations period, Brooks Brothers would have revived its 346 line of stores and opened one at Heritage Square. Gumwood's new argument does not speak to that issue.

the annual rents set forth in the lease, and since Gumwood did not offer a basis to project Ann Taylor's annual sales, upon which its rent payments would have been calculated, the jury will have no basis on which to determine the revenues Heritage Square would have received from Ann Taylor. Accordingly, the jury may have to count the entire tenant allowance as a loss, and subtract that amount from any additional revenues Heritage Square would have earned from other actual and prospective tenants. Even in that worst case scenario for Gumwood, though, the jury would still have a basis to calculate damages, and could find that Heritage Square's gains from other tenants had Ann Taylor opened would have offset its costs and losses. For that matter, Heritage Square's net revenues from Ann Taylor would be negative for this period even if the co-tenancy provision *was* met, as the tenant allowance ($654,610) would have exceeded the rent payments ($583,201). Thus, even in that best case scenario, Gumwood cannot argue that it sustained damages during this period from Ann Taylor itself—the only question is how much its costs to lease to Ann Taylor would reduce the damages Gumwood might have sustained through other retailers. In either scenario, though, the jury would have a basis upon which to calculate damages. Therefore, the Court finds that there is enough of an evidentiary basis for this theory that it can be presented at trial. Accordingly, the Court grants Gumwood's motion in limine in part, in that Gumwood may present its damages computation for the period of July 1, 2007 to December 31, 2010.

## D.      Conclusion

Gumwood's motion in limine [DE 309] is granted in part and denied in part. As explained above, Gumwood may seek the damages outlined in its motion in limine for lost revenues for the period up to December 31, 2010. However, it may not seek as damages the reduction in market value of Heritage Square as of January 2011.

Finally, since the extent of the damages that Gumwood will be able to pursue at trial has been dramatically limited since the parties last engaged in mediation, the Court orders the parties to attend another mediation session. If the parties are unable to agree on a mediator, the Court will refer this case for a settlement conference with the magistrate judge. The parties are ordered to file a status report identifying their mediation date, or requesting a judicial settlement conference, by August 7, 2017.

SO ORDERED.

ENTERED:  July 17, 2017

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court